69 A.3d 1247

ESTATE OF NAITIL DESIR, BY AND THROUGH ITS LAWFULLY APPOINTED ADMINISTRATRIX EDMONDE ESTIVERNE, AND EDMONDE ESTIVERNE, INDIVIDUALLY AND ON BEHALF OF THE HEIRS AT LAW AND DEPENDENTS OF NAITIL DESIR, PLAINTIFFS, AND ESTATE OF COSME NOVALY, BY AND THROUGH ITS LAWFULLY APPOINTED ADMINISTRATOR WILNER NOVALY, AND WILNER NOVALY, INDIVIDUALLY AND ON BEHALF OF THE HEIRS AT LAW AND DEPENDENTS OF COSME NOVALY, PLAINTIFFS–RESPONDENTS, v. JEAN ROBERT VERTUS, INDIVIDUALLY AND ON BEHALF OF VERTUS FINANCIAL SERVICES AND VERTUS FINANCIAL SERVICES, DEFENDANTS–APPELLANTS, AND JEAN ROBERT VERTUS, DEFENDANT/THIRD–PARTY PLAINTIFF, v. EARL EASTERLING, LOUIS BOGGS, AND LETRAY EVANS, THIRD–PARTY DEFENDANTS.

Argued September 11, 2012—Decided May 20, 2013.

*Michael Dolich,* argued the cause for appellants (*Bennett Bricklin & Saltzburg* and *Ronca, Hanley, Nolan & Zaremba,* attorneys; *John J. Ronca, Jr.,* on the briefs).

*Alexandra A. Conti,* argued the cause for respondent (*Conti & Conti,* attorneys).

Justice HOENS delivered the opinion of the Court.

In this appeal we consider whether the tragic shooting death of an individual by a criminal fleeing from a business gives rise to a cause of action sounding in tort on behalf of the decedent's estate against the owner of the business premises.

The representatives of the decedent's estate assert that it was the owner's acts of leaving the premises in response to his belief that "something" was wrong and of asking decedent for assistance that eventually led to the decedent's shooting death when he went to investigate. They contend that in these circumstances, the business owner owed their decedent a duty of care, the breach of which renders him liable for the death.

The business owner, on the other hand, argues that he merely asked the decedent to use a telephone, that he told the decedent all of the facts he knew and on which he based his request, and that he never suggested that decedent should leave his place of safety and rush down the street. He asserts that under the circumstances, he owed decedent no duty of care and he contends, arguing in the alternative, that to the extent that a duty was owed, his limited request and complete disclosure of the facts known to him satisfied that duty.

Faced with determining whether the premises owner in these circumstances owed the decedent a duty of care, the trial court concluded that he did not, granting summary judgment in favor of the owner of the business premises. The Appellate Division, in a published opinion, reached the opposite conclusion, reasoning that the decedent was owed a duty of care under the circumstances. *Estate of Desir v. Vertus*, 418 *N.J.Super.* 310, 313, 13 *A.*3d 428 (App.Div.2011). Relying on established concepts of premises liability, including those relating to duties owed for criminal acts and for injuries sustained off-site, and finding further support in the rescue doctrine, the appellate court disagreed with the trial court's analysis. It concluded instead that "one who has reason to believe that an intruder on his premises poses a danger to others owes a

duty of reasonable care to a friend whom he brings to the danger by a request for assistance." *Ibid.*

We are now called upon to consider whether there is a duty of care owed under these circumstances. Our evaluation of this question requires us to address fundamental considerations that govern the imposition of a duty in any case, and to do so in light of existing concepts of tort law governing premises liability, duties owed for criminal acts of third parties, and the rescue doctrine.

Our evaluation of those concepts in the context of the facts contained in this record leads us to conclude that the Appellate Division erred in imposing a duty of care on a person who left his premises and requested that a neighbor use a telephone to call the premises, who told the neighbor what he had observed before he left the premises, but who then failed to prevent the neighbor from going to the scene where he encountered a fleeing robber who shot him. We therefore reverse.

## I.

There is no dispute about the relevant facts, the substance of which is derived largely from the deposition of defendant Jean Robert Vertus. At the time of the events in question, Vertus owned a three-story building in Irvington, which had a single apartment on each floor. Vertus lived in the second-floor apartment, and he also used that apartment for the purpose of operating his business, defendant Vertus Financial Services. He testified that the building was located in an area of "bad crime," where "you have to be scared for your life[,]" and that shortly before the incident in question, someone had been killed one block away from his building. Vertus himself had been the victim of a robbery three years earlier when an intruder had entered his business and stabbed him. He explained that after that robbery, he had a family member install a security system that included cameras and a buzzer that controlled entry into the building and the second-floor apartment.

According to Vertus, on September 3, 2003, he and a client were seated at his dining room table, where they were conducting business. When they finished at approximately 5:00 p.m., both he and the client got up from the table. Vertus then turned toward the back of the apartment while the client headed toward the living room so that she could leave. As the client was about to enter the living room, Vertus saw her "step back" as if she "saw something" in the living room. Although neither that client nor any of the other people who were in the living room said anything and although there were no other sounds coming from the living room, Vertus believed that "something [was] wrong." When questioned during his deposition about what he thought might have been wrong, Vertus surmised that it might have been a "robbery or something."

Vertus did not call out or go to investigate what might have been happening in the living room. Instead, he left the apartment through a side door that led to steps by which he could go outside. On his way down the stairs, he stopped and knocked on the door of the first-floor tenant, hoping to find a telephone to call 911. When no one answered his knock, Vertus made his way through several hedges that he described as shrub fences separating the adjoining properties. He passed the first house because no one lived there and he passed the second house because its elderly residents did not have a telephone. He reached the third house, where plaintiffs' decedent Cosme Novaly and his roommate, referred to in the record only as Mr. St. Louis, lived in the basement. Vertus knew Novaly and St. Louis because they had used his business services in the past.

Vertus told Novaly and St. Louis that he had seen his client "move back" and that because of "the way she moved it seemed like something was going on in [his] business." He asked them to use their telephone to call his business and to find out if anyone answered the phone. Novaly complied with this request, but got no answer because the line was busy. Vertus did not tell Novaly and St. Louis that he thought there might be a robbery in

progress and did not ask them to call 911, because, as he later explained, "I didn't know what [was] going on. I didn't know what happened.... I didn't see anything."

Vertus concedes that "[he] came to them to ask, you know, for help[,]" and that they did as he asked when they placed a call to his business. He also concedes that after making the telephone call and getting no answer, Novaly and St. Louis left the apartment while Vertus remained behind. Although he did not ask Novaly or St. Louis to investigate what was transpiring at his business, he also admits that he thought they were walking in that direction and were trying "to see what [was] going on[.]"

Shortly after Novaly and St. Louis left the basement apartment, Vertus heard the sound of a gunshot and he then used their telephone to call 911. Approximately three to five minutes later, when he heard the police arrive, Vertus went outside, where he saw Novaly lying on the sidewalk in front of his building with a gunshot wound. He applied pressure to the wound until the ambulance arrived to take Novaly to the hospital where he later died.

The police investigation revealed that three intruders had entered Vertus's business, demanded money, assaulted several clients and employees, and fatally shot Naitil Desir, one of the clients who was present. The investigation also determined that Novaly had been shot by one of the robbers on the sidewalk outside of the building as the group was fleeing the scene.

The complaint in this matter was filed on behalf of the Estate of Naitil Desir, the patron who was shot to death inside the business, and plaintiffs Estate of Cosme Novaly, the neighbor who was shot to death on the sidewalk outside, and its administrator. The complaint named Vertus individually and his business, Vertus Financial Services, as defendants. Both Estates alleged that their decedents were lawful business invitees on defendants' premises and that they were shot and killed due to defendants' negligence.

Both defendants moved for summary judgment in response to the claims made on behalf of the Novaly Estate and its administrator. The trial court granted those motions, concluding that under the circumstances, there could be no liability because Vertus owed no duty to Novaly. In explaining its reasoning, the trial court noted that the only request that Vertus made to Novaly was a limited one, observing that

the best one can say here is that Mr. Vertus requested the use of the phone. He didn't request Mr. Novaly to go over to his business. He didn't request him to stop the robbery. He didn't tell him to go over and ... intervene in some other way[.]

Moreover, the trial court found that Vertus told Novaly "all the information he actually knew[,]" and that there was no evidence that "Vertus had a level of knowledge, which would indicate that he should have told Mr. Novaly that there was an armed robbery [taking] place." Following a trial of the claims raised by the Estate of Desir, who had been shot inside the business premises, and which ended in a verdict in favor of defendants, plaintiffs Estate of Novaly and the Estate's Administrator appealed from the trial court's order granting summary judgment on their separate claims.

In a published opinion, the Appellate Division reversed the trial court's order granting defendants' motion for summary judgment against Novaly's estate and its administrator. *Ibid.* The appellate panel concluded that Vertus owed a duty of care to Novaly, holding that "one who has reason to believe that an intruder on his premises poses a danger to others owes a duty of reasonable care to a friend whom he brings to the danger by a request for assistance." *Ibid.*

In reaching that conclusion, the Appellate Division recognized that neither the application of principles governing premises liability nor resort to the rescue doctrine would lead to any imposition of liability on Vertus. *Id.* at 315, 13 *A.*3d 428. Instead, the panel used general tort law concepts and analyzed principles governing foreseeability of harm to conclude that Vertus owed Novaly a duty of care. *Id.* at 316–22, 13 *A.*3d 428.

In particular, the Appellate Division found support in our case law relating to foreseeability of harm and probability of injury that had resulted in the imposition of a duty of care in a variety of circumstances. *Id.* at 316–17, 13 *A.*3d 428; *see Olivo v. Owens–Illinois, Inc.,* 186 *N.J.* 394, 402–04, 895 *A.*2d 1143 (2006) (imposing duty on landowner for condition on site that caused off-premises injury to foreseeable victim); *Hill v. Yaskin,* 75 *N.J.* 139, 144, 147–48, 380 *A.*2d 1107 (1977) (imposing duty on owner of vehicle that injured another when it was stolen after owner left it in high crime area with key inside vehicle). The panel also relied in part on the role played by foreseeability as it relates to the rescue doctrine. *Estate of Desir, supra,* 418 *N.J.Super.* at 317–18, 13 *A.*3d 428; *see Ruiz v. Mero,* 189 *N.J.* 525, 528–29, 917 *A.*2d 239 (2007) (explaining relationship of foreseeability of rescue to imposition of duty); *Saltsman v. Corazo,* 317 *N.J.Super.* 237, 247–48, 721 *A.*2d 1000 (App.Div.1998) (imposing duty of care on one who negligently imperils himself and foreseeably invites rescue); *Arvanitis v. Hios,* 307 *N.J.Super.* 577, 580–81, 705 *A.*2d 355 (App. Div.1998) (imposing duty on woman who summoned her unsuspecting nephew when her husband refused to take his medications which she knew created potential for him to become violent).

In addition, the panel was persuaded by the reasoning of two federal court decisions, *see Wood v. Ostrander,* 879 *F.*2d 583, 586 (9th Cir.1989) (imposing duty on police who left passenger of intoxicated driver stranded in high crime area after driver's arrest); *Bowers v. De Vito,* 686 *F.*2d 616, 618 (7th Cir.1982) (stating principles but imposing no duty arising from parolee's murder of plaintiff's decedent), and found support in general tort law principles equating an act that is intended to place another in unreasonable risk of harm with negligence. *See Estate of Desir, supra,* 418 *N.J.Super.* at 318, 13 *A.*3d 428 (citing *Restatement (Second) of Torts* § 303 (1965)).

Drawing upon principles of premises liability, the rescue doctrine, and more general tort theories, the appellate court observed that "[i]n [its] view, however, even if a person who seeks assis-

tance from an untrained person not present at the scene has not contributed to the creation of the peril, he has, by the stimulus of his conduct in requesting assistance, acted to bring the untrained assistant to the danger." *Ibid.*

In short, the panel concluded that there was a duty owed by Vertus to Novaly because "where an imperiled person draws in another to his predicament, it is foreseeable that the person drawn in will be injured unless the victim exercises due care." *Id.* at 321, 13 *A.*3d 428. Using this foundation, the Appellate Division concluded that "[t]he facts in this case support the imposition of a duty of reasonable care based on Vertus's conduct that he knew or should have known would bring Novaly to the danger that caused his injury and death." *Id.* at 320, 13 *A.*3d 428.

Vertus filed a petition for certification, which we granted. 208 *N.J.* 337, 27 *A.*3d 950 (2011).

## II.

Vertus presents two arguments for this Court's consideration. First, he asserts that the Appellate Division erred in creating a duty of care that essentially imposes an obligation on innocent crime victims to refrain from seeking assistance from others. He argues that the panel's holding represents a significant departure from principles governing both premises liability and the rescue doctrine, because there is no evidence that he created the dangerous situation and because the panel's holding would impose liability on him for the criminal acts of others over whom he had no control.

Second, Vertus argues that even if the duty that the Appellate Division identified is consistent with prevailing principles of tort law, the panel erred in concluding that, in the circumstances presented, he was legally obligated to share his "thoughts" or beliefs that a robbery might have been in progress. In this regard, he contends that imposing this new duty on him would be unfair in light of the limited assistance he actually sought and the

objectively adequate disclosure he made to Novaly concerning what he knew about the events unfolding at the business premises.

In response to these arguments, plaintiffs contend that the Appellate Division's holding did not depart from traditional tort law principles because it was based on ordinary considerations of duty and foreseeability. As such, plaintiffs argue that the appellate court took careful account both of the deterrent purpose served by tort theories and of the basic fairness of imposing a duty of care on one, like Vertus, who reasonably foresees the increased risk posed by summoning assistance when confronted with a known or suspected danger.

Plaintiffs contend that, rather than being an expansion of recognized duties of care, imposing a duty of care on Vertus is entirely consistent with the traditional factors that are relevant in the tort context. *See Hopkins v. Fox & Lazo Realtors*, 132 *N.J.* 426, 439, 625 *A*.2d 1110 (1993) (identifying relevant factors to be relationship between parties, nature of attendant risk in light of hazard presented, ability and opportunity to exercise care, and public interest).

Finally, plaintiffs assert that it is not unfair to impose a duty of care on Vertus. They contend that although Vertus did not create the peril itself, he enhanced the risk to others by failing to tell Novaly that he feared that there was a robbery in progress and by failing to dissuade Novaly from rushing to the scene.

### III.

The Appellate Division recognized that neither established principles governing premises liability nor those that relate to the rescue doctrine apply to the unusual factual circumstances presented by these tragic events. *See Estate of Desir, supra,* 418 *N.J.Super.* at 315, 319, 13 *A*.3d 428. In analyzing whether Vertus owed Novaly a duty of care, however, the appellate court drew on concepts found in each of these theories of liability. Our resolution of the issues presented in this matter therefore must begin with an explanation of the traditional tort concepts governing

premises liability, including a premises owner's liability for crimes that occur outside of the premises, and the more recently developed concepts relating to duty in the context of the rescue doctrine.

### A.

The duty owed by a premises owner, referred to as premises liability, depends in general upon the application of well-established categories through which the status of the injured party is used to define both duty and foreseeability. Traditionally, our common law approach to premises liability has been

> predicated on the status of the person on the property at the time of injury. Historically, the duty of the owner or occupier to such a person is gauged by the right of that person to be on the land. That status is determined by which of three classifications applies to the entrant, namely, that of a business invitee, licensee, or trespasser.
>
> [*Hopkins, supra,* 132 *N.J.* at 433, 625 *A.*2d 1110 (citing *Snyder v. I. Jay Realty Co.,* 30 *N.J.* 303, 153 *A.*2d 1 (1959)).]

The status-based evaluation of duty recognizes the differences in the relationship between the premises owner and each of these three categories of injured party. "The first come by invitation, express or implied; the second are those who are not invited but whose presence is suffered; the third are neither invited nor suffered." *Lordi v. Spiotta,* 133 *N.J.L.* 581, 584, 45 *A.*2d 491 (Sup.Ct.1946). As we have recently explained, "[t]he common law categories are a shorthand, in well-established classes of cases, for the duty analysis; they, too, are based on the relationship of the parties, the nature of the risk, the ability to exercise care, and considerations of public policy." *Rowe v. Mazel Thirty, LLC,* 209 *N.J.* 35, 45, 34 *A.*3d 1248 (2012). More particularly, as we have explained, these "common law classifications bear with them established duties on a sliding scale; 'as the legal status of the visitor improves, the possessor of land owes him more of an obligation of protection.'" *Id.* at 43–44, 34 *A.*3d 1248 (quoting W. Page Keeton et al., *Prosser and Keeton on Torts* § 58, at 393 (5th ed.1984)).

■ In spite of our continued adherence to this traditional status-based approach, we have also recognized that it is not always possible to fit a particular plaintiff precisely into one of these established categories. In those circumstances, we have concluded that courts must resort to "a full duty analysis," *id.* at 44, 34 *A.*3d 1248 in order to determine whether the premises owner will be liable for an injury. That analysis rests upon whether the imposition of a general duty to exercise reasonable care to prevent foreseeable harm is fair and just under the circumstances. For the purposes of engaging in the full duty analysis, we have required the evaluation of four factors: the relationship of the parties; the nature of the risk; the ability to exercise care; and public policy considerations. *Hopkins, supra,* 132 *N.J.* at 438–39, 625 *A.*2d 1110.

■ Over time, we have also been called upon to consider questions concerning more expansive duties owed by premises owners to injured persons, including duties owed in two settings that are relevant to the question now before us. In the first circumstance, we have addressed whether a premises owner owes a duty of care to others who sustain off-premises injuries. *See Kuzmicz v. Ivy Hill Park Apts.,* 147 *N.J.* 510, 515, 688 *A.*2d 1018 (1997). In that context we set forth the guiding principles for the analysis of whether or not a duty would be imposed in any particular situation, explaining:

> Ultimately, the determination of the existence of a duty is a question of fairness and public policy. Foreseeability of injury to another is important, but not dispositive. Fairness, not foreseeability alone, is the test. Relevant to the determination of the fairness of the imposition of a duty on a landowner is the nature of the risk, the relationship of the parties, the opportunity to exercise care, and the effect on the public of the imposition of the duty.
>
> [*Id.* at 515, 688 *A.*2d 1018 (citations omitted).]

■ In general, using our traditional duty analysis, we have concluded that a landowner is "not liable for off-premises injuries merely because those injuries are foreseeable." *Id.* at 518, 688 *A.*2d 1018. Therefore, in a case in which the premises owner neither created the risk of harm nor exercised control over the

location where the harm occurred, we declined to impose a duty of care. *Id.* at 521–23, 688 *A.*2d 1018 (concluding that apartment building owner owed no duty to tenant injured after taking shortcut through fence around building owner's property and onto adjoining land where he was stabbed). We have, however, concluded that a premises owner owes a duty of care to one injured off premises if the source of the injury is a dangerous condition on the premises and if the injury is the result of a foreseeable risk to an identifiable person. *See Olivo, supra,* 186 *N.J.* at 404–05, 895 *A.*2d 1143 (concluding that employer owed duty to employee's wife who was exposed to and injured by asbestos carried home on employee's clothing).

■ The second circumstance in which we have permitted an expansion of the general rules relating to the liability of premises owners and that is germane for purposes of this appeal has arisen in the context of criminal acts of third parties. It has historically been held that individuals, including business premises owners, are not generally responsible for the criminal acts of others. *See Prosser and Keeton on Torts, supra,* § 33, at 201. That general rule, however, admits of exceptions, largely based on an analysis of whether the premises owner exercised reasonable care under the circumstances.

As an example, this Court concluded that the owner of a supermarket that was located in a high crime area owed a duty of care to a patron who was attacked and robbed in its parking lot. *See Butler v. Acme Markets, Inc.,* 89 *N.J.* 270, 280, 445 *A.*2d 1141 (1982) (relying on and quoting *Restatement (Second) of Torts* § 344 and comment f). That holding, however, rested on evidence that the supermarket's owners were aware of several prior muggings on the premises, that they posted no warnings, and that the single security guard who was on duty was required to focus on preventing shoplifting and other thefts in the store along with patrolling the premises inside and out. *Id.* at 274–75, 445 *A.*2d 1141.

We later extended our analysis of the scope of the duty owed to patrons who are outside a business and who are crime victims. *See Clohesy v. Food Circus Supermarkets,* 149 *N.J.* 496, 516–17, 694 *A.*2d 1017 (1997). Expanding on the rule announced in *Butler,* we held that the premises owner's duty to provide a safe place for patrons to conduct business did not depend on the owner's knowledge of prior criminal acts on the property, but could arise based on the owner's awareness of more generally occurring criminal acts nearby. *Ibid.* However, in considering a business owner's liability for an injury caused by a criminal act, in both *Butler* and *Clohesy* this Court addressed circumstances in which the crime occurred on the owner's property. *See Clohesy, supra,* 149 *N.J.* at 517, 694 *A.*2d 1017; *Butler, supra,* 89 *N.J.* at 274, 445 *A.*2d 1141. In each, the crime itself was committed in a grocery store's parking lot and the foreseeability analysis turned in large part on the owner's awareness of prior crimes on its property, as in *Butler,* or nearby, as in *Clohesy.*

We have not, as our holding in *Kuzmicz* demonstrates, imposed an expansive duty of care on premises owners for injuries that occur off-site simply because they are foreseeable. *Kuzmicz, supra,* 147 *N.J.* at 518, 688 *A.*2d 1018. Rather, as we have recognized, because imposing a duty based on foreseeability alone could result in virtually unbounded liability, *see id.* at 522–23, 688 *A.*2d 1018, we have been careful to require that the analysis be tempered by broader considerations of fairness and public policy, *id.* at 515, 688 *A.*2d 1018.

## B.

The rescue doctrine serves an entirely different purpose and evolved as an adjunct to the doctrine of contributory negligence. It originated as a response to the argument that one who rushed into danger to rescue another and was injured in the effort was contributorily negligent for his own injuries and therefore was barred from recovering for those injuries in tort. *See Saltsman, supra,* 317 *N.J.Super.* at 247, 721 *A.*2d 1000 (citing and quoting

*Wagner v. Int'l Ry. Co.*, 232 *N.Y.* 176, 133 *N.E.* 437, 437 (1921)). The rescue doctrine therefore achieves two analytical goals. First, it prevents the plaintiff rescuer who has voluntarily placed himself or herself in danger in order to save another from peril from being found to be contributorily negligent as a matter of law. *See ibid.* Second, it also creates a duty of care on the part of the one whose negligence has placed another in the peril that invited the rescuer to intervene. *See ibid.* (citing *Provenzo v. Sam,* 23 *N.Y.2d* 256, 296 *N.Y.S.2d* 322, 244 *N.E.2d* 26, 28 (1968)).

█ The rescue doctrine rests on the recognition that when the victim being rescued is blameless, the rescuer has a cause of action for injuries sustained in the rescue, but that cause of action is against the party who created the peril. *Ibid.* The doctrine permits the injured rescuer to maintain a cause of action against the one whose negligence placed the victim in imminent danger, because it is that negligence that has given rise to the intervention of the rescuer. *See Eyrich ex rel. Eyrich v. Dam,* 193 *N.J.Super.* 244, 256, 473 *A.2d* 539 (App.Div.), *certif. denied,* 97 *N.J.* 583, 483 *A.2d* 127 (1984).

Our Appellate Division has also permitted an injured rescuer to maintain a cause of action against the rescued victim, but only in limited circumstances. That is, if "the rescued victim . . . is either completely, or partially, at fault for creating the peril that invited the rescue[,]" *Saltsman, supra,* 317 *N.J.Super.* at 249, 721 *A.2d* 1000, then the rescuer may proceed against the rescued victim. In expanding the rescue doctrine to encompass that circumstance, the Appellate Division commented that the view that the rescued victim whose negligence created the peril, in whole or in part, could be liable to the rescuer was both widely accepted, *id.* at 248–49, 721 *A.2d* 1000 (citing W.C. Crais III, Annotation, *Rescue Doctrine: Negligence and Contributory Negligence in Suit by Rescuer Against Rescued Person,* 4 *A.L.R.3d* 558 (1965)), and not inconsistent with existing case law in New Jersey, *id.* at 248, 721 *A.2d* 1000 (citing *Butler v. Jersey Coast News Co.,* 109 *N.J.L.* 255, 257–58, 160 *A.* 659 (E. & A.1932)).

This evolution of the rescue doctrine remains grounded upon essential tort concepts of duty and foreseeability. As the doctrine has been explained, an actor is liable for harm sustained by a rescuer "where the conduct of the actor has created a danger only to himself, if at the time of such conduct he should reasonably anticipate that others might attempt to rescue him from his self-created peril, and sustain harm in doing so." *Restatement (Second) of Torts* § 445 comment d.

The rescue doctrine therefore creates a cause of action for an injured rescuer against the one being rescued in particular circumstances. In order to be consistent with well-settled concepts of duty and foreseeability, there will only be liability if the one being rescued is the one who completely or partially created the peril that invited the rescue. Thus, calling one's unsuspecting nephew to one's home to assist with a violent spouse, *see Arvanitis, supra,* 307 *N.J.Super.* at 580, 705 *A.2d* 355, and instigating an altercation with a group of others, *see Saltsman, supra,* 317 *N.J.Super.* at 240–41, 247–48, 721 *A.2d* 1000, represent examples falling well within the parameters of the rescue doctrine in which rescuers were permitted to proceed against the victim based on the victim's role in creating the peril.

## IV.

The traditional articulations of premises liability and the rescue doctrine do not provide an avenue for Novaly's Estate or its administrator to proceed against Vertus. Viewed as an application of traditional premises liability, the record falls short because the injury occurred on a public sidewalk outside of Vertus's business and was the result of a criminal act. Viewed in the context of the rescue doctrine, Vertus did not create the peril because he did not create the circumstance of the crime. Moreover, Vertus, when he got to the Novaly apartment, had reached a place of safety and Novaly did not act in a way that would rescue Vertus.

As neither of these doctrines can supply the basis for a cause of action on Novaly's behalf, we must engage in the traditional, comprehensive analysis of whether a duty is owed, *see Hopkins, supra,* 132 *N.J.* at 439, 625 *A.2d* 1110, in order to determine whether Vertus owed Novaly a duty of care.

It has long been true that "[d]eterminations of the scope of duty in negligence cases has traditionally been a function of the judiciary." *Kelly v. Gwinnell,* 96 *N.J.* 538, 552, 476 *A.2d* 1219 (1984); *see Hopkins, supra,* 132 *N.J.* at 439, 625 *A.2d* 1110. In carrying out this important function, we have recognized that "[t]he actual imposition of a duty of care and the formulation of standards defining such a duty derive from considerations of public policy and fairness." *Hopkins, supra,* 132 *N.J.* at 439, 625 *A.2d* 1110. Although we have identified a four-part framework that guides our analysis, we have "carefully refrained from treating questions of duty in a conclusory fashion, recognizing that '[w]hether a duty exists is ultimately a question of fairness.'" *Weinberg v. Dinger,* 106 *N.J.* 469, 485, 524 *A.2d* 366 (1987) (emphasis and citation omitted) (quoting *Goldberg v. Housing Auth. of Newark,* 38 *N.J.* 578, 583, 186 *A.2d* 291 (1962)).

Our most cogent explanation of the principles that guide us in determining whether to recognize the existence of a duty of care was set forth in *Hopkins, supra,* where we observed that

[w]hether a person owes a duty of reasonable care toward another turns on whether the imposition of such a duty satisfies an abiding sense of basic fairness under all of the circumstances in light of considerations of public policy. *Goldberg, supra,* 38 *N.J.* at 583 [186 *A.2d* 291]. That inquiry involves identifying, weighing, and balancing several factors—the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution. *Ibid.* The analysis is both very fact-specific and principled; it must lead to solutions that properly and fairly resolve the specific case and generate intelligible and sensible rules to govern future conduct.

[*Hopkins, supra,* 132 *N.J.* at 439, 625 *A.2d* 1110.]

Although it is to these fundamental factors that our attention must turn, we begin in this matter by reiterating the guiding principle last quoted, that in the end we must take care because any

resolution we reach will apply not only in this case, but instead must be one that will "generate intelligent and sensible rules to govern future conduct." *Ibid.; see Gantes v. Kason Corp.,* 145 *N.J.* 478, 489, 679 *A.*2d 106 (1996) (observing that one general "purpose of tort laws is to encourage reasonable conduct and, conversely, to discourage conduct that creates an unreasonable risk of injury to others"); *accord Sciarrotta v. Global Spectrum,* 194 *N.J.* 345, 357, 944 *A.*2d 630 (2008).

That point bears repeating here because the function of the common law is not to achieve a result in a particular case, but to establish generally applicable rules to govern societal behaviors. Craft a rule that is inherently fact-specific and we risk creating an outcome that reaches only the particular circumstances and parties before the Court today; create a broadly worded duty and we run the risk of unintentionally imposing liability in situations far beyond the parameters we now face.

The facts of the matter before us present precisely this dilemma. First, in considering the relationship of the parties, for example, shall we define Vertus and Novaly as friends? As businessman and client? As neighbors? As frightened man and person with a telephone? The possibilities are virtually endless. Unlike earlier decisions of this Court imposing a duty on someone, there is no clear or single relationship that we can identify to which the proposed duty would attach or in which it would be binding. This matter is therefore different from our earlier decisions in which we could identify the relationship between the parties with great precision, as with, for example, social host and invited party guest, *see Kelly, supra,* 96 *N.J.* at 540, 547–48, 476 *A.*2d 1219, or realtor hosting an open house and prospective purchaser, *see Hopkins, supra,* 132 *N.J.* at 431, 444–45, 625 *A.*2d 1110, or grocery store owner and patron, *see Butler, supra,* 89 *N.J.* at 274–75, 445 *A.*2d 1141.

Similarly, in evaluating the nature of the attendant risk, are we to define it as the risk that Novaly would decide that he should rush down the street to investigate rather than use the telephone

to summon help or simply stay inside with Vertus? Is it instead the risk that the business premises were being robbed by an armed man? Is it the risk that Novaly would trip on the sidewalk outside of the premises or be chased into the street by an unarmed fleeing thief and be hit by a bus or instead that he would be shot or stabbed by a fleeing robber? These variables present a stark contrast to our earlier decisions, in which the nature of the attendant risk was always reasonably well-defined, as for example, that the party guest would drink to excess and then drive, *see Kelly, supra,* 96 *N.J.* at 548, 476 *A.*2d 1219, or that the open house invitee would be injured while walking through the premises, *see Hopkins,* 132 *N.J.* at 443, 625 *A.*2d 1110, or that the grocery store patron would be mugged in the parking lot, *see Butler,* 89 *N.J.* at 274–75, 445 *A.*2d 1141.

So too, the issue of the opportunity and ability to exercise care poses a poorly defined question in this case, largely because it is not especially clear what opportunity or ability is being considered. Is it Vertus's opportunity to tell Novaly that the neighborhood in which they both lived was dangerous? Was Vertus expected, after revealing to Novaly all of the facts he actually knew, to add conjecture and surmise that an armed robber would soon flee the premises and shoot someone on the sidewalk? Was Vertus to exercise some sort of ability to stop Novaly from venturing forth from the place of safety and checking out the situation down the road? Did Vertus even have an opportunity or ability to avoid the harm that befell Novaly that was in any sense superior to Novaly's own opportunity and ability to act with the care that a reasonably prudent person would have exercised? As with our analysis of the traditional considerations of relationship between the parties and attendant risk, our earlier decisions imposing duties that have considered the opportunity and ability to exercise care have arisen in far more confined circumstances. *See, e.g., Hopkins, supra,* 132 *N.J.* at 444, 625 *A.*2d 1110 (considering that real estate broker's customary inspection of property prior to open house will reveal defects and conditions that otherwise might cause injury to potential buyer); *Kelly, supra,* 96 *N.J.*

at 548–50, 476 *A*.2d 1219 (suggesting that imposition of duty on social host will serve to limit intoxication of guests and reduce instances of drunk driving); *Butler, supra,* 89 *N.J.* at 279–80, 445 *A*.2d 1141 (recognizing supermarket owner's duty to exercise reasonable care to safeguard patrons from criminal attacks in light of "known, repeated history of attacks on the premises"). Indeed, the opportunity and ability to exercise care will vary depending on which risk we use to define the situation in which the actors find themselves. Unlike our earlier decisions analyzing the imposition of a duty, the widely varying ways in which one might define the opportunity and ability to avoid harm in this matter make it so unlike the well-defined scenarios that we have previously considered as to make identification of the duty impossible.

Likewise, the public interest in the proposed solution also varies based on how we define the parties, the risk, and the opportunity and ability of each in this circumstance. Although one might conclude that there is a strong public interest that favors protecting each other from harm, there is an equally strong interest that we not visit liability on one who is in danger not of his or her own making and who simply, and predictably, calls for help. Although we might all agree that the public interest is served by imposing a duty that operates to deter drunken driving, *see Kelly, supra,* 96 *N.J.* at 544–45, 476 *A*.2d 1219, that requires supermarkets to take reasonable measures to protect their customers from attack, *see Butler, supra,* 89 *N.J.* at 278–79, 284, 445 *A*.2d 1141, or that motivates realtors to identify and warn of dangerous conditions of property when hosting open houses, *see Hopkins, supra,* 132 *N.J.* at 448–49, 625 *A*.2d 1110, the public interest to be served in imposing a duty on defendants in this matter is far from clear.

Finally, we have cautioned that "the determination of the existence of a duty is a question of fairness and public policy. . . . Foreseeability of injury to another is important, but not dispositive. . . . Fairness, not foreseeability alone, is the test." *Kuzmicz, supra,* 147 *N.J.* at 515, 688 *A*.2d 1018 (internal citations omitted). In deciding whether to recognize the existence of a duty of care,

therefore, we cannot focus on any single one of the criteria we have established for this purpose, but rather must bear in mind the broader implications that will flow from the imposition of a duty. Foreseeability, while an important consideration, cannot become a substitute for a robust and thorough analysis of all of the other factors that go into the consideration of the imposition of a new or expanded duty of care.

## V.

It is with these considerations in mind that we address the matter now before this Court. We do so by restating the holding of the Appellate Division, for it best expresses the parameters of the duty that we are called upon to either embrace or reject.

The Appellate Division defined this new duty as follows: "We hold that one who has reason to believe that an intruder on his premises poses a danger to others owes a duty of reasonable care to a friend whom he brings to the danger by a request for assistance." *Estate of Desir, supra*, 418 *N.J.Super.* at 313, 13 *A*.3d 428.

This articulation of the duty includes all of the following elements: a premises owner, apparently including either a business or personal premises; a "reason to believe" that might include anything from speculation to actual knowledge; an intruder who poses a danger to others, either inside or outside of the premises and of apparently any kind; a friend, as opposed to a business invitee or individual in some other status; and one who is brought to the danger by a request for assistance, without regard to whether the request actually entailed going to the place of danger. Seen in this light, it becomes apparent that the stated holding cannot have the sort of general applicability that is found in the duties that we have previously imposed. *See Hopkins, supra*, 132 *N.J.* at 439, 625 *A*.2d 1110 (observing that duty analysis "must lead to solutions that properly and fairly resolve the specific case and generate intelligible and sensible rules to govern future conduct"). As a result, it cannot advance that essential function of

the tort law that expresses our shared beliefs as to fundamental rules that govern the conduct of others in our society.

In crafting this new duty, the appellate panel strove to create a generally applicable rule, and did so by blending concepts of premises liability and the rescue doctrine, gleaned from our decisions in *Olivo, supra,* 186 *N.J.* at 402–04, 895 *A.*2d 1143, and *Hill, supra,* 75 *N.J.* at 143, 147, 380 *A.*2d 1107, together with similar concepts derived from federal case law, *see Wood, supra,* 879 *F.*2d at 591; *Bowers, supra,* 686 *F.*2d at 618. The result of this effort was that the appellate court created a conduct-based approach for determining whether a duty is owed which relied on the foreseeability of an increased risk of hazard to an individual due to a third party's criminal act. That approach, however, is ill-suited for the imposition of a duty in the circumstances of the matter before us.

First, the two federal decisions offer little persuasive weight because one arose in the context of the duty of a police officer to a member of the public, *see Wood, supra,* 879 *F.*2d at 586, and the other imposed no duty on the state in the context of a woman stabbed to death by a deranged man who had been recently released from a mental health facility, *see Bowers, supra,* 686 *F.*2d at 618. Second, the approach used by the appellate court made foreseeability of the particular outcome that Novaly actually suffered the essential core of the analysis of whether a duty was owed. That is, by focusing on the harm that befell Novaly, and by considering expansively the information Vertus had, the court created a duty that is essentially based on an evaluation of how Vertus might have interpreted the potential threat but did not. Although recognizing that at a trial governed by this newly crafted duty Vertus might well be found on this record to have no liability at all, the panel did not consider whether the duty being defined might not be one that would advance the ordinary goals of our tort laws.

 As the panel's decision reveals, this may have been the result of overlooking the requisite consideration of what should be

the true focus of any potential expansion of a duty in tort, which is an evaluation of the public interest. *See Hopkins, supra,* 132 *N.J.* at 439, 625 *A.*2d 1110. In considering whether to impose a duty on anyone or any class of individuals, it is essential to recognize not the interests of the particular individuals before the Court, but instead to take careful consideration of the effect that the creation of a duty will have more generally on the public. Each time that this Court has created a new common law duty, this focus has been paramount.

It is with that concern before us that we consider whether there is a duty owed by Vertus to Novaly. Certainly, the interests of the particular plaintiffs, Novaly and the representatives of his estate, would be served were there to be a source of recovery for his death at the hands of the robber who fled from Vertus's place of business. But that does not necessarily coincide with the public interest. *See Kuzmicz, supra,* 147 *N.J.* at 523, 688 *A.*2d 1018 ("We empathize with the desire to compensate the victim of a criminal attack. That desire, however, should not predetermine the existence of the duty of a property owner for off-premises injuries.").

Part of an evaluation of the public interest must be the consideration of how establishing this duty will work in practice. This proposed duty is both broadly defined and narrowly crafted, with the result that it either applies to every person who calls out for help under any circumstance or applies only to the particular and peculiar facts that arose between Vertus and Novaly. Surely the public interest is not served by a rule that falls short of one that has general application, because it creates far more confusion and uncertainty than such a rule should express if it is to be a useful tool. *See Goldberg, supra,* 38 *N.J.* at 589, 186 *A.*2d 291 (observing that imposition of vaguely-described duty is unfair because "[f]airness ordinarily requires that a man be able to ascertain in advance of a jury's verdict whether the duty is his and whether he has performed it"). By the same token, we have recognized that a carefully drawn articulation of a duty can serve to confine a

defendant's exposure to liability by addressing a specific, articulable risk, thereby achieving the goals of our tort laws without adverse public policy consequences. *See Olivo, supra,* 186 *N.J.* at 405, 895 *A.*2d 1143.

In the context of this case, we find no basis on which to impose a duty in tort on Vertus. He knew only that his client stepped back as if she had seen something. He heard no calls for help or sounds of a struggle. He knew no more about the actual circumstances unfolding in his office than that which he disclosed to Novaly. And he knew no more about the general dangers of the neighborhood than did the others living nearby, including his neighbor Novaly. He had installed a security system that was intended to prevent intruders from entering. At most, when he left by the side door, he thought something was wrong and, when deposed, suggested that he thought it might have been a "robbery or something." Whatever instinctive reaction caused Vertus to leave the building, the actual information that he had concerning the attendant risk is vague and diffuse, offering a poor basis on which to attempt to craft a generally applicable rule in tort.

So, too, was the request that Vertus made of his neighbor a limited one. When Vertus arrived at Novaly's residence, both of them were in a place of complete safety. Vertus only asked Novaly to telephone the business and see who answered. He did not ask Novaly to call 911 because he believed he had too little information to pass along to the police. He did not ask Novaly to rush down the street or take matters into his own hands; in fact it is not clear that he actually knew that Novaly was doing anything other than stepping outside to peek down the road.

We recognize, as did the appellate panel, that the facts before us are tragic and that the victim and his survivors are rightly deserving of our sympathy. But the function of the law, and in particular the common law governing tort recoveries, cannot be driven by sympathy or overshadowed by the effects of tragedy. Rather, the function of tort law is deterrence and compensation, and absent circumstances in which the definition of

the duty can be applied both generally and justly, this Court should stay its hand. In the end, although creating a cause of action to suit these facts might serve the ends of these particular plaintiffs, we cannot say that it would advance the public interest or lead to a rule that would sensibly, predictably, and fairly govern future conduct.

## V.

The judgment of the Appellate Division is reversed.

Chief Justice RABNER and Justices LaVECCHIA and PATTERSON join in Justice HOENS's opinion. Justice ALBIN filed a separate, concurring opinion.

Justice ALBIN, concurring.

Defendant Jean Robert Vertus ran to the house of his friend, neighbor, and client, Cosme Novaly, for help when he suspected that his business office might be the target of a robbery. As Judge Cardozo famously said: "Danger invites rescue," and "[t]he cry of distress is the summons to relief." *Wagner v. Int'l Ry. Co.*, 232 *N.Y.* 176, 133 *N.E.* 437, 437 (1921). Unlike the majority, I agree with the Appellate Division that Vertus had a duty to disclose to Novaly what he knew about the danger toward which he drew his friend and business client. *In re Estate of Desir v. Vertus*, 418 *N.J.Super.* 310, 320–22, 13 *A.*3d 428 (App.Div.2011). But Vertus fulfilled that duty when he told Novaly what he observed that caused him concern for his safety. That Novaly walked towards Vertus's office and was shot and killed by robbers fleeing from the scene is tragic. But Vertus cannot be held responsible for Novaly's death because he did not breach a duty to warn. For that reason, I concur with the majority that the wrongful-death suit brought by Novaly's estate against Vertus must be dismissed.[1]

---

[1] For purposes of this appeal, plaintiffs are Cosme Novaly's estate through its administrator, Wilner Novaly, who also has sued individually, and on behalf of

## I.

Here are the undisputed facts that lead me to the conclusion that it would be fair to impose on Vertus a duty to warn. Vertus operated a business offering financial services from a second-floor apartment in a crime-ridden area of Irvington. He had been robbed and stabbed there just three years earlier.

In the early evening of September 3, 2003, he noticed "something" unusual as he completed business with a client. As the client began to leave and enter an adjacent room, she stepped back. The client did not scream or say anything, but based on the backward movement Vertus surmised that "something" was wrong, that maybe a robbery was occurring—although he neither observed nor heard anything to substantiate that suspicion. Fearing the worst, Vertus took flight out a side door and sought help from Novaly and his roommate, St. Louis, who lived two houses away. Novaly and St. Louis were not just Vertus's neighbors, they were friends—"just like family in the community"—and business clients.

Vertus related to Novaly and St. Louis exactly what he observed and his suspicion that "it seemed like something [was] going on in [his] business." He did not say he thought it might be a robbery. However, Novaly and St. Louis obviously knew that Vertus was frightened, otherwise he would not have fled his office. Vertus asked them to call his business. When Novaly and St. Louis received a busy signal, they left their apartment and walked in the direction of Vertus's business "to see [what was] going on" because—in Vertus's words—he had come "to them to ask . . . for help." Novaly was fatally shot on the sidewalk after three robbers exited from Vertus's building, apparently making their escape.

The trial court concluded that Vertus owed no duty of care to Novaly. The Appellate Division reversed and held that "one who

---

Cosme's heirs and dependents. For the sake of brevity, I refer to all as Novaly's estate.

has reason to believe that an intruder on his premises poses a danger to others owes a duty of reasonable care to a friend whom he brings to the danger by a request for assistance." *Desir, supra,* 418 *N.J.Super.* at 313, 13 *A.*3d 428. The only issue before us is whether Vertus owed a duty to warn Novaly of the dangers into which Vertus had drawn him. I believe he did.

## II.

### A.

The classification of duties is not always an easy task, and this case is no exception. We have recognized that "[r]esort to the common law methodology with its insistence on traditional classifications" will "not necessarily provide reliable guidance in determining the existence and scope of [a] duty of care." *Hopkins v. Fox & Lazo Realtors,* 132 *N.J.* 426, 438, 625 *A.*2d 1110 (1993). Thus, the question, simply stated, is whether the imposition of a "duty to exercise reasonable care in preventing foreseeable harm . . . is fair and just" "in light of the actual relationship between the parties" and the unique circumstances of the case. *See ibid.* (citations omitted). In determining whether fairness and public policy require the imposition of a duty, we generally weigh several factors: " 'the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution.' " *Carvalho v. Toll Bros. & Developers,* 143 *N.J.* 565, 573, 675 *A.*2d 209 (1996) (quoting *Hopkins, supra,* 132 *N.J.* at 439, 625 *A.*2d 1110).

Here, Vertus turned to Novaly and St. Louis, who were neighbors, friends, and clients—persons he expected would respond to his plea for help. Moreover, given their relationship, it should have been foreseeable to Vertus that Novaly and St. Louis would render assistance, and indeed Vertus expressed no surprise that they left their home to check on his business.

The nature of the risk may be very great if those who are called or expected to act are unaware of the gravity of the danger that

awaits them. Although Vertus did not see armed intruders, he escaped through a side door fearing that something very wrong, perhaps a robbery, was occurring on his premises. To be forewarned is to be forearmed. Without the information that Vertus possessed, Novaly would have been at a serious disadvantage in gauging the proper response to the situation.

In the circumstances before us, Vertus had ample opportunity and ability to exercise due care. To fulfill his duty of care, all that was required of Vertus was to pass along as much information as he possessed so that Novaly did not proceed toward an unknown danger. That hardly could be considered a burden. Imposing on Vertus the duty to give a proper warning of a known peril to the person from whom he was seeking assistance involved no expense and, at most, a trifling burden.

Last, the public has an interest in demanding that one who calls for help from those who will naturally respond give fair warning of known dangers. It would offend basic notions of fairness if Vertus could seek help from Novaly, with whom he had a special relationship, expect him to act, and then leave him blind to the danger ahead by withholding vital or, perhaps, lifesaving information.

### B.

Although "there generally is no duty to protect others against harm from third persons," W. Page Keeton et al., *Prosser and Keeton on Torts* § 56, at 385 (5th ed.1984), a person may have a special responsibility to exercise reasonable care when he is in a "unique position to prevent the harm," *id.* at § 33, at 202–03. A person may also "be held liable because his affirmative conduct has greatly increased the risk of harm to the plaintiff through the criminal acts of others." *Id.* at § 33, at 203; *see also Restatement (Second) of Torts* § 302B ("An act or an omission may be negligent if the actor realizes or should realize that it involves an unreasonable risk of harm to another through the conduct of the other or a third person which is intended to cause harm, even though such conduct is criminal.").

Although there is no precedent in this State directly on point with the facts before us, we can draw principles from other cases that should inform our approach. A property owner has a duty to warn a social guest of a dangerous condition on the property of which the owner is aware. *Parks v. Rogers,* 176 *N.J.* 491, 497–98, 825 *A.*2d 1128 (2003). That is a fair proposition because "the social guest should be at no greater risk than the landowner, who, by reason of his knowledge of the property, has the ability to protect himself against a dangerous condition." *Id.* at 498, 825 *A.*2d 1128 (citing *Hopkins, supra,* 132 *N.J.* at 433–34, 625 *A.*2d 1110). With that principle in mind, does it make sense that Vertus would have been obliged to warn Novaly of a faulty step leading to his front door if he had invited him to his home but not about a danger lurking in his home, say robbers, if he had incited him to render assistance there? Because "foreseeability of harm" is " 'a crucial element in determining whether imposition of a duty ... is appropriate,' " *Olivo v. Owens–Illinois, Inc.,* 186 *N.J.* 394, 402–03, 895 *A.*2d 1143 (2006) (quoting *Carvalho, supra,* 143 *N.J.* at 572, 675 *A.*2d 209), the defendant's apprehension of the danger to which he is exposing his social guest or friend should weigh heavily in the analysis.

Moreover, we have not taken a crabbed view of foreseeability when imposing a duty of care to prevent harm to others. In *Hill v. Yaskin,* 75 *N.J.* 139, 147, 380 *A.*2d 1107 (1977), we held that a defendant car owner could be held liable for a breach of duty of care to some yet unknown victim by leaving keys in an unlocked automobile in a lot in a high-crime area. The theory of liability was that it was foreseeable that an unlocked car with keys in the ignition would be stolen, thereby increasing the risk of harm to others, such as pedestrians or other motorists. *Id.* at 147–48, 380 *A.*2d 1107. Was the danger to Novaly, had he not been properly warned, any less foreseeable than the danger to some unidentifiable member of the public in *Hill?*

Accordingly, I believe that Vertus owed a duty of care to Novaly—a friend, neighbor, and client from whom he sought

assistance. Vertus was obliged to give fair warning of the potential dangers in his business office from which he had fled. That is, if Vertus had actually observed gun-wielding intruders, he could not have withheld those facts from Novaly. Vertus had the ability to exercise reasonable care for his own benefit based on the information available to him. Vertus could not deny the same vital information to Novaly, whom he incited to act on his behalf.

### III.

In the end, however, I conclude that Novaly's estate does not have a viable cause of action and that the trial court properly granted summary judgment. I reach that conclusion because, even given plaintiffs' best-case scenario, no breach of duty can be shown. Vertus told both Novaly and St. Louis all that he had observed as well as his supposition that something was wrong. Vertus did not have to announce to Novaly the natural and probable inferences to be drawn from what Vertus had observed. Any reasonable person could have drawn the inference that a robbery *might* be in progress. Novaly did not stand in an inferior position to Vertus in his ability to exercise reasonable care.

### IV.

For these reasons, I agree with the Appellate Division that Vertus owed a duty to warn Novaly. Because Vertus fulfilled his duty, I concur with the majority that summary judgment must be entered in his favor.

*For reversal*—Chief Justice RABNER, and Justices LaVECCHIA, ALBIN, HOENS and PATTERSON—5.

*Opposed*—None.