**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-1505-18T1
               A-1513-18T1
               A-1516-18T1

MICHAEL ROUDI, LORRAINE
ROUDI, THERESA NILES, EMMA
JANE DECKER, EUGENE DUROCHER,
JR., MARY DUROCHER, PATRICIA
KRONE, BETTY ANN FULLER,
THOMAS REINHART, and SUSAN
REINHART,

      Plaintiffs-Appellants,

v.

JERSEY CENTRAL POWER AND
LIGHT, FIRST ENERGY
CORPORATION, NEW JERSEY
NATURAL GAS COMPANY, and
NEW JERSEY RESOURCES
CORPORATION,

      Defendants-Respondents.

_____

E.J. HARVEY, JR, JUNE SQUILLARO,
JOSEPH SQUILLARO, VINCENT
D. PIPERI, CHRISTINE O'HAGAN,

MICHAEL O'HAGAN, JOSEPH KESLO,
CATHY KESLO, MARIANNE JONES,
KENNETH FLOWERS,
CINDY FLOWERS, LILY HAWRYLUK,
SANDY TURNER, CHERYL
LUCKY, and DALE PARISI,

      Plaintiffs-Appellants,

v.

JERSEY CENTRAL POWER AND
LIGHT, FIRST ENERGY
CORPORATION, NEW JERSEY
NATURAL GAS COMPANY, and
NEW JERSEY RESOURCES
CORPORATION,

      Defendants-Respondents.
_____

SUSAN MINUTELLA, RONALD
MAVUS, LINDA POMPLIANO,
DON SMITH, LINDA SEUFERT,
ANTHONY MARCANTONIO, JOAN
BECHTLE, TONI ALBANESE,
JAMES ALBANESE, FRANK DELLE
DONNE, ANNEMARIE DELLE
DONNE, LORRAINE KOSINSKI,
STANLEY KOSINSKI, JOSEPH
SACCO, DAVIDA SACCO, DURBIN
DON MCDERMOTT, MADELINE
MCDERMOTT, SALLY GILLIS, BOB
GILLIS, IRENE MOYER, JANICE
DIANA, and WAYNE DIANA,

        Plaintiffs-Appellants,

v.

2

A-1505-18T1

JERSEY CENTRAL POWER AND
LIGHT, FIRST ENERGY
CORPORATION, NEW JERSEY
NATURAL GAS COMPANY, and
NEW JERSEY RESOURCES
CORPORATION,

       Defendants-Respondents.
_____

Argued March 11, 2020 – Decided April 3, 2020

Before Judges Fuentes, Haas and Mayer.

On appeal from the Superior Court of New Jersey, Law Division, Ocean County, Docket Nos. L-2955-14, L-3256-14 and L-1646-15.

Hugh M. Turk argued the cause for appellants (Sullivan Papain Block Mc Grath & Cannavo, attorneys; Hugh M. Turk, on the briefs).

Stephen A. Rudolph argued the cause for respondents Jersey Central Power and Light and First Energy Corporation (Rudolph & Kayal, attorneys; Stephen A. Rudolph, on the brief).

Edwin J. Chociey argued the cause for respondents New Jersey Natural Gas Company and New Jersey Resources Corporation (Riker Danzig Scherer Hyland & Perretti, attorneys; Edwin J. Chociey and James C. Meyer, on the briefs).

PER CURIAM

    The plaintiffs in these three consolidated actions were residents of Camp Osborn, a small community on the Barnegat Peninsula in Brick Township.

               A-1505-18T1

Defendant Jersey Central Power and Light (JCP&L, which includes its parent company First Energy Corporation) provided electrical service to plaintiffs, and defendant New Jersey Natural Gas Company (NJNG, which includes its parent company New Jersey Resources Corporation) furnished natural gas service to the community. The two utilities (collectively defendants) owned or managed the electrical and gas systems in and near Camp Osborn, including all transmission and control apparatus.

Sometime in the early evening on October 29, 2012, the day Superstorm Sandy struck New Jersey, a fire destroyed plaintiffs' residences. Plaintiffs thereafter commenced an action in the Law Division in which they alleged that flooding and high winds from the storm could have compromised JCP&L's and NJNG's equipment in an unspecified way that contributed to the fire. Plaintiffs claimed that the fire might have been avoided had defendants preemptively suspended service to Camp Osborn by "de-energizing" their distribution lines so there would have been no electricity or gas to start or fuel a fire.

The Law Division determined that the Board of Public Utilities (the Board) had primary jurisdiction of the dispute and transferred the action to that administrative agency. Following proceedings in the Office of Administrative Law (OAL), the Board held that defendants had no statutory or regulatory duty

to suspend service preemptively to Camp Osborn. After the Board returned the matter to the Law Division to address the remaining negligence issue, the trial court found that defendants had no duty at common law to discontinue services to the area prior to the storm making landfall, granted defendants' motion for summary judgment, and dismissed plaintiffs' complaints.

Plaintiffs now appeal from the Law Division's November 7, 2018 orders, and raise the same arguments they unsuccessfully pressed before the trial court. Having reviewed plaintiffs' contentions in light of the record and applicable law, we affirm substantially for the reasons expressed by Judge Craig L. Wellerson in his thoughtful oral opinion addressing each of the matters at issue.

I.

The parties are fully familiar with the lengthy procedural history and facts of this matter. Therefore, we need only recite the most salient facts here and, like Judge Wellerson, view them in the light most favorable to plaintiffs. Polzo v. Cty. of Essex, 209 N.J. 51, 56 n.1 (2012) (citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 523 (1995)).

Beginning on October 26, 2012, three days before Superstorm Sandy reached New Jersey, NJNG and other utilities participated in a series of conference calls with representatives of the Board and other State agencies. In

a certification submitted in the OAL, NJNG's senior vice-president for energy delivery explained that "there was never any discussion during those calls about preemptive suspension of gas and/or electric service by NJNG or any other utility. That was because neither the [Board] nor the utilities viewed widespread suspension prior to the storm as a viable, much less favorable, option."

Indeed, as the Board later found in its written decisions concluding that defendants had no statutory or regulatory duty to preemptively suspend service to plaintiffs' community on the Barnegat Peninsula:

> suspension of service could have caused further widespread service disruptions and damage. In particular, NJNG has presented undisputed evidence that a preemptive suspension would have required NJNG to terminate service to a large geographic area from Old Bridge, extending south along the coast in Monmouth County and through the entirety of the seaside peninsula and Long Beach Island, and inland through portions of Monmouth and Ocean Counties. Suspension of service could have affected tens of thousands of NJNG customers, including hospitals, governmental services, traffic controls and bridge controls. NJNG could also have had to depressurize[] 150 miles of distribution and associated service lines . . . in order to remove vast amounts of gas.
>
> [(citations to the record omitted).]

The Board explained that suspending natural gas service to this large area would not have been in the public interest because

A-1505-18T1

depressurization could have required NJNG to cut access points in the distribution system and thereafter blow the gas out into the environment. Due to the volume of gas trapped in the lines, the procedure would have taken several hours. Depressurizing the distribution lines could cause flood water to infiltrate the gas distribution system. Flood water, particularly salt water, in the system would have led to substantial internal corrosion, which would have resulted in an increased number of gas leaks in the distribution system. . . . It would have taken much longer and been more expensive for NJNG to get the system back up and running if water had entered the distribution facilities. Restoration of gas service would have prolonged the outage because it would have required NJNG to make multiple visits to each customer's house to restore service.

[(citations to the record omitted)].

Similarly, the Board found that "[h]ad JCP&L preemptively suspended service, traffic signals, life support systems, water pumps and communications systems would not operate." Accordingly, the Board "did not order or direct JCP&L or NJNG to preemptively suspend service" to Camp Osborn or any other specific area.

Likewise, when the Governor issued Executive Order No. 104 on October 27, 2012, to address the risks anticipated from Superstorm Sandy, he did not order any utility to suspend service to any community. Instead, the Governor directed all residents of barrier islands to evacuate their homes due to the

likelihood of heavy flooding, power outages, and other conditions that imperiled public safety.

As Superstorm Sandy approached on October 29, "[i]t was impossible to predict with any degree of reliability where, and even if, [the storm] would hit along the New Jersey coast." The eye of the storm ultimately made landfall near Brigantine. At approximately 6:00 p.m., JCP&L "'proactively' shut down power to 25,000 customers on the barrier islands[1] in Monmouth and Ocean counties," and remotely de-energized several substations that would have been flooded by the high tide.

A little over an hour later, an individual called the Brick Township Fire Department (the Department) from an unstated location to report "a fire and exploding transformers on the Camp Osborn properties." The Department attempted to reach the camp, but all routes were impassible. On November 2, 2012, the Department's chief "observed that Camp Osborn was mostly

---

[1] As noted above, Camp Osborn is located on the Barnegat Peninsula, which is often mischaracterized as a barrier island. However, it is not. (See, e.g., https://readynj.wordpress.com/2012/10/27/list-of-new-jersey-barrier-island-communities (last visited March 13, 2020), and https://www.nad.usace.army.mil/Media/News-Releases/Article/1047544/army-corps-awards-contract-to-complete-construction-of-northern-ocean-county-du (last visited March 13, 2020)).

destroyed," but the prevailing "devastation" prevented an investigation and the Department's report concluded that the cause of fire could not be determined.

## II.

Because these facts were not in dispute, the parties agreed that the question of whether defendants had a statutory or regulatory duty to proactively and preemptively de-energize their gas and electric services in advance of, or during, Superstorm Sandy was a strictly legal one, and should be resolved on motions for summary decision. After the Administrative Law Judge (ALJ) rendered her initial decision,[2] the Board addressed the question "of whether NJNG and/or JCP&L failed to provide safe, adequate and proper service by not discontinuing utility service prior to Superstorm Sandy."

In three written decisions rendered on October 20, 2017, the Board answered this inquiry in the negative. The Board found "that there is no statutory or regulatory obligation for a utility to preemptively suspend service in the event of a weather emergency pursuant to New Jersey" statutes or the Board's regulations. And, as noted above, the Board thoroughly explained that preemptively shutting off gas and electric services to a large section of the shore

---

[2] The ALJ determined that the issues presented did not "involve a tariff or a public-utility regulation requiring the Board's expertise," and recommended dismissing the parties' motions and returning the matter to the Law Division.

spanning several counties would have caused much more harm than continuing coverage for as many customers as possible during and after the storm. Thus, following "its own investigation into utility responses to Superstorm Sandy," the Board found "no basis in the record to conclude that NJNG or JCP&L violated their obligations to provide safe, adequate and proper service" to their customers, including plaintiffs. Plaintiffs do not challenge the Board's determination in these consolidated appeals.

III.

The Board then referred the matter back to the Law Division to enable it to address the question of whether defendants had a common law duty to suspend service to Camp Osborn and were negligent in failing to do so. The parties relied on the factual record developed before the Board, and defendants filed a motion for summary judgment, arguing that they violated no duty owing to plaintiffs in advance of the storm.

In response, plaintiffs submitted a certification from an expert, who had been involved in emergency management work for Con Edison in New York City during Superstorm Sandy. The expert opined that because JCP&L could have preemptively suspended service to Camp Osborn, it had a duty to take that action. The expert failed to address the Board's conclusion that defendants did

not violate "their obligations to provide safe, adequate and proper service" to their customers. The expert also did not allege that NJNG breached any duty owed to plaintiffs.

Judge Wellerson conducted two days of oral argument on defendants' motions for summary judgment. Although given the opportunity to do so, the parties were unable to identify any New Jersey court decision, or any decision from any other state, holding that utilities have a duty to discontinue service to a specific community in advance of a storm where, as here, "[i]t was impossible to predict with any degree of reliability where, and even if, [the storm] would hit." Accordingly, Judge Wellerson applied well-settled rules governing negligence cases in considering the motions.

By way of background, "a negligence cause of action requires the establishment of four elements: (1) a duty of care, (2) a breach of that duty, (3) actual and proximate causation, and (4) damages." Jersey Cent. Power & Light Co. v. Melcar Util. Co., 212 N.J. 576, 594 (2013). The focus in this case was on the first element, duty of care.

To pursue defendants on a claim of negligence, plaintiffs needed to establish that defendants had a duty of care and that defendants breached it. Townsend v. Pierre, 221 N.J. 36, 51 (2015). The existence of a duty of care is

a question of law. Kernan v. One Washington Park Urban Renewal Assocs., 154 N.J. 437, 445 (1998); Clohesy v. Food Circus Supermarkets, 149 N.J. 496, 502 (1997). It is "ultimately a question of fairness," which "involves a weighing of the relationship of the parties, the nature of the risk, and the public interest in the proposed solutions." Kelly v. Gwinnell, 96 N.J. 538, 544 (1984) (quoting Goldberg v. Hous. Auth. of Newark, 38 N.J. 578, 583 (1962)). The court starts by finding whether the danger in question was foreseeable in the circumstances of the particular case, based on "the relationship between the plaintiff and the tortfeasor, the nature of the risk, and the ability and opportunity to exercise care." Carvalho v. Toll Bros. & Developers, 143 N.J. 565, 573 (1996) (quoting Carter Lincoln-Mercury, Inc. v. EMAR Grp., 135 N.J. 182, 194 (1994)).

However, foreseeability does not end the inquiry. "Foreseeability of injury to another is important, but not dispositive." Kuzmicz v. Ivy Hill Park Apartments, Inc., 147 N.J. 510, 515 (1997). "[B]ecause imposing a duty based on foreseeability alone could result in virtually unbounded liability, [courts] have been careful to require that the analysis be tempered by broader considerations of fairness and public policy." Estate of Desir ex rel. Estiverne v. Vertus, 214 N.J. 303, 319 (2013).

Accordingly, the plaintiff with a negligence claim must establish grounds for a "value judgment, based on an analysis of public policy, that the actor owed the injured party a duty of reasonable care." Kelly, 96 N.J. at 544. The court must then decide whether "fairness and policy" justify imposing a duty to prevent that danger, which is an inquiry that "involves identifying, weighing, and balancing several factors—the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution." Carter, 135 N.J. at 194-95 (quoting Hopkins v. Fox & Lazo Realtors, 132 N.J. 426, 439 (1993)).

In deciding whether to recognize a new duty, courts must remember that "the function of the common law is not to achieve a result in a particular case, but to establish generally applicable rules to govern societal behaviors." Estate of Desir, 214 N.J. at 323. "[I]t is essential . . . to take careful consideration of the effect that the creation of a duty will have more generally on the public. Each time that [the Supreme] Court has created a new common law duty, this focus has been paramount." Id. at 328. "By the same token, [the Court has] recognized that a carefully drawn articulation of a duty can serve to confine a defendant's exposure to liability by addressing a specific, articulable risk,

thereby achieving the goals of our tort laws without adverse public policy consequences." Id. at 328-29.

Like all questions of law, determinations about the existence of a duty of care are reviewed de novo, because appellate courts are not bound by a trial court's interpretation of the law or of the legal consequences of uncontested facts. Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995). That rule applies only to the legal conclusions that the Board drew from the facts, not to its factual findings. Bd. of Educ. of Englewood Cliffs v. Bd. of Educ. of Englewood, 257 N.J. Super. 413, 456 (App. Div. 1992) ("an agency's factual determinations are presumptively correct and will not be upset absent a showing that they are arbitrary, capricious or unreasonable"). "Courts should be sensitive to purported legal claims that are really regulatory issues" within the agency's special expertise and therefore its primary jurisdiction. Boss v. Rockland Elec. Co., 95 N.J. 33, 42 (1983). "The trial court should accept the factual determinations of the agency and lay them against the legal issues to be resolved and enter its final judgment resolving the mixed questions of law and fact based upon the agency fact finding." Ibid.

Applying these principles to the unique facts of this case, Judge Wellerson concluded there was no duty at common law to suspend utility service

preemptively as plaintiffs argued unless the circumstances afforded specific notice of the location and nature of the danger. As noted above, those circumstances plainly did not exist in this case.

As the judge found, while utilities are required "to act swiftly and without delay to prevent dangers from . . . palpably identifiable dangers," the danger here was not so identifiable, because the storm was "hundreds of miles wide," and it was a "super storm" because its wind speeds were below the threshold of seventy-five miles per hour for designating the storm as a hurricane. The only certainty was that "the Jersey coast would be inundated with storm water flooding, high winds, and the like." The prospective damage at any particular location "was somewhat uncertain," and the greatest damage was determined only afterward to have occurred "some [seventy] miles north of the eye of the storm."

Judge Wellerson explained that utilities are not insurers against damage from service interruptions, or from events such as "explosions by fire and the like," because that "would place a crushing burden" on them. He distinguished plaintiffs' claim for a prospective suspension of service from the claim in Farrell v. N.J. Power & Light Co., 111 N.J.L. 526, 535 (E. & A. 1933), a case in which a gas company was held liable because it had "both direct and constructive

notice of a leakage of gas from its main" at a particular location of the manhole where the explosion that damaged the plaintiff's property later occurred.

Judge Wellerson further explained that the Legislature placed "a statutory duty" on defendants, which it crafted by balancing the interests of all New Jersey residents and electing to facilitate the "primary interest in being served with adequate and continuous uninterrupted flow of power," without imposing a duty of "prospective" action "to ensure against any dangers which may flow from the power." He found no case in any jurisdiction that imposed such a duty, and he noted that a California case cited to him, Lowenschuss v. S. Cal. Gas Co., 11 Cal. App. 4th 496 (Ct. App. 1992), denied such a duty.

Judge Wellerson acknowledged that, in hindsight, "certain homeowners would have benefited from a termination in . . . the supply of gas and electric" service. However, he found it beyond dispute that a mandatory evacuation order was not guaranteed to result in complete evacuation, and that the safety of those who failed to evacuate would still require electrical and gas service: "just because there has been a mandatory evacuation order doesn't mean that people's lives would [not] be placed in jeopardy had they lost power, had they lost gas." Utilities understood themselves to have a statutory mandate to continue service to all customers for that reason, and the duty that plaintiffs urged would have

16

created a new obligation to assess whether that mandate was outweighed by plaintiffs' later-determined interest in suspending service. Judge Wellerson found that serving plaintiffs' interest would be "a new duty" that "has never existed in any jurisdiction prior to this date," and therefore one that "must come from the Legislature and not the courts."

Thus, Judge Wellerson granted summary judgment to defendants and dismissed plaintiffs' complaints. This appeal followed.

IV.

On appeal, plaintiffs argue that the judge erred by granting defendants' motions for summary judgment. We disagree.

Our review of a ruling on summary judgment is de novo, applying the same legal standard as the trial court, namely, the standard set forth in Rule 4:46-2(c). Conley v. Guerrero, 228 N.J. 339, 346 (2017). Thus, we consider whether "the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Town of Kearny v. Brandt, 214 N.J. 76, 91 (2013) (quoting Brill, 142 N.J. at 540). If there are no genuine issues of material fact, we must then decide whether the trial court correctly interpreted the law. See Prudential Prop. & Cas. Co. v.

17

Boylan, 307 N.J. Super. 162, 167 (App. Div. 1998).  We accord no deference to the trial judge's conclusions on issues of law and review those issues de novo.  Nicholas v. Mynster, 213 N.J. 463, 478 (2013).

As Judge Wellerson correctly found, it was impossible to predict with any reliability where, and even if, Superstorm Sandy would strike the New Jersey coast or, more specifically, plaintiffs' small community.  While it may have been possible to shut down all electric and gas service to customers in Camp Osborn, accomplishing this task would have caused numerous logistical and technical problems resulting in serious adverse consequences for thousands of utility customers, including citizens, hospitals, emergency rescue units, and government services across an extremely large geographic area.

In addition, neither the Governor nor the Board ordered defendants to suspend service in advance of the storm to the Barnegat Peninsula or any part of the New Jersey.  Nothing in the statutes and regulations governing the utilities required them to take this prophylactic action, and their individual tariffs charged them with an overarching duty to provide continuous, uninterrupted service to their customers.

After balancing "the relationship of the parties," the foreseeability and nature of the risk of harm, "the opportunity and ability to exercise care, and the

18

public interest," Hopkins, 132 N.J. at 439, we are satisfied that Judge Wellerson properly concluded that defendants did not breach any duty they owed to plaintiffs under the idiosyncratic circumstances presented here. Therefore, we affirm his well-reasoned decision to grant defendants' motions for summary judgment and dismiss plaintiffs' complaints.

In so ruling, we also agree Judge Wellerson appropriately concluded that the case law plaintiffs relied upon in support of their contentions was plainly distinguishable from the unique facts presented by Superstorm Sandy. Unlike in the case at hand, the bulk of plaintiffs' citations involved a utility's duties in installing or maintaining specific facilities or in actively providing services to a particular location. See, e.g., Black v. PSE&G, 56 N.J. 63, 72-73 (1970) (finding that when installing and maintaining uninsulated high voltage power lines, electric company owed high degree of care "to others who in the course of their ordinary and lawful activities might suffer injury, death or damage therefrom" and "to adjust degree of care exercised" to "commonly known technological advances"); Beck v. Monmouth Lumber Co., 137 N.J.L. 268, 269, 278 (E. & A. 1948) (electric utilities found liable when worker was killed upon contact with electric wire while repairing a crane); Heyer v. JCP&L, 106 N.J.L. 211, 212-13 (E. & A. 1929) (electric utility found liable for causing worker's

19

death by placing high-tension line five feet from building's wall); Anderson v. Jersey City Elec. Light Co., 63 N.J.L. 387, 388-90 (Sup. Ct. 1899) (electric utility has a duty to use a "high degree of care" to maintain insulation of current in location where it is reasonably probable that people will place by it to enter a workplace).

Plaintiffs also cited inapposite cases involving a utility's duty to suspend service after it has received notice that its facilities are damaged and thus present a danger to the public. See, e.g., Adams v. Atlantic City Elec. Co., 120 N.J.L. 357, 364 (E. & A. 1938) (electric utility had duty to refrain from transmitting electricity to high-tension line at specific point where accident had occurred and had left line in dangerous position); Gereghty v. Wagner, 117 N.J.L. 174, 174-76 (E. & A. 1936) (electric company, after knowledge of disturbance along high-tension line, had duty to refrain from transmitting electrical energy that might cause injury to persons lawfully on a highway); Robbins v. Thies, 117 N.J.L. 389, 393-94 (E. & A. 1937) (addressing electric utility's duty to cease, "without unreasonable delay" after knowledge of accident and "trouble along its line," transmitting electricity through a high-tension line that had fallen onto a highway at point that might injure persons lawfully on the road).

None of these cases are comparable to this matter in which plaintiffs seek to impose upon defendants a new, far-reaching duty to preemptively suspend regular electric and natural gas service to thousands of customers in a large area while their systems are functioning properly, and before a forecasted major weather event, and before any damage to the utilities' systems has occurred. All of this case law is about the duty at common law to provide uninterrupted service, or to respond to actual or constructive notice of a flaw or condition that is suggestive of a danger in an area that is to some degree defined or delimited. In that regard, these cases respect the guiding principle of negligence law that a duty must be declared in a manner that guides future conduct with readily ascertainable parameters. Plaintiffs have not articulated a duty to that standard and, therefore, Judge Wellerson properly dismissed their complaints.

V.

We briefly address two additional arguments raised by plaintiffs. First, they assert that Judge Wellerson improperly relied upon the Board's findings in reaching his decision that defendants owed no duty to them to suspend electric and gas service in advance of the storm. This argument lacks merit.

As discussed above, the Board found that: (1) defendants were "not required by any statutory provision in Title 48, Board regulation or utility tariff

21

to preemptively suspend service"; and (2) "JCP&L and NJNG's determinations not to preemptively discontinue service do not constitute a failure to provide safe[,] adequate and proper service." The Board based these determinations on the factual record developed by the parties in the OAL proceedings, as evidenced by the ALJ's detailed findings of fact, which were largely incorporated by the Board in its decisions.

As our Supreme Court has explained:

> where the resolution of a contested legal issue properly brought before a court necessarily turns on factual issues within the special province of an administrative agency, the court should refer the factual issues to that agency. The trial court should accept the factual determinations of the agency and lay them against the legal issues to be resolved and enter its final judgment resolving the mixed questions of law and fact based upon the agency fact finding.

[Boss, 95 N.J. at 42 (emphasis added).]

Thus, Judge Wellerson properly relied on the Board's factual determinations in concluding that defendants owed no legal duty under the common law to suspend service to plaintiffs.

Plaintiffs also allege that the judge erred by giving too much weight to the decision of the California Court of Appeals in Lowenschuss. We disagree.

22

In Lowenschuss, the plaintiff homeowners sued a gas utility, alleging that it had negligently failed to shut off the flow of gas within their neighborhood when it was aware that a major fire was likely to reach the area. 11 Cal. App. 4th at 497-98. The homeowners argued that the utility's negligence in failing to discontinue the gas flow proximately caused an explosion and fire, which destroyed their home. Id. at 497-98. The Court of Appeals dismissed the homeowners' complaint, and emphasized that if it held that the utility owed such a duty, the risk of liability for public gas companies would be unreasonably broad. Id. at 500-01.

Contrary to plaintiffs' assertion, although Judge Wellerson mentioned the Lowenschuss decision in his oral opinion, it was certainly not the linchpin of his analysis of the question of whether defendants had a duty to suspend service to plaintiffs under New Jersey law. Thus, we reject their contention that the judge "erred in relying on outdated California law when analysis under New Jersey law would have led to a different conclusion."

To the extent we have not specifically addressed any other arguments raised by plaintiffs, we find them without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

## VI.

In sum, we conclude that Judge Wellerson properly determined that defendants did not owe plaintiffs a legal duty to preemptively suspend electric and natural gas services to their community. Therefore, we affirm the judge's decision granting defendant's motion for summary judgment and dismissing plaintiffs' negligence complaints.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1505-18T1