**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1412-21

ANNE STULPIN, JUDITH L.
FRAME, DANIEL CIFONI, and
GABRIELLE MICHAELIS,

     Plaintiffs-Appellants,

v.

PATRICK J. BASTIAN, DYAN M.
FUREY, DEUTSCHE BANK
SECURITIES, INC., DEUTSCHE
BANK NATIONAL TRUST
COMPANY,

     Defendants-Respondents,

and

BAYSIDE CONDOMINIUM
ASSOCIATION, BOROUGH OF
STONE HARBOR, a Municipal
Corporation of the State of NEW
JERSEY, MICHAEL
KOOCHEMBERE, Building
Sub-Code Official and Building
Inspector for the BOROUGH OF
STONE HARBOR, ROS-LEN, INC.,
d/b/a ROS LEN BUILDERS,
JEROME C. LICATA, and

LEONARD LICATA,

Defendants.

_____

Submitted December 7, 2022 – Decided August 26, 2024

Before Judges Accurso, Vernoia and Natali.

On appeal from the Superior Court of New Jersey,
Law Division, Cape May County, Docket No.
L-0131-16.

Daly & Clemente, PC, and McLaughlin & Lauricella,
PC, attorneys for appellants (Michael A. Clemente and
Slade H. McLaughlin, on the brief).

Ronald Gellert (Gellert Scali Busenkell & Brown,
LLC), attorney for respondents Patrick J. Bastian and
Dyan M. Furey.

Hinshaw & Culbertson LLP, attorneys for respondent
Deutsche Bank National Trust Company, as Trustee,
on Behalf of the Holders of the WA-MU Pass-
Through Certificates, Series 2005-AR6 (Michael D.
LiPuma, on the brief).

The opinion of the court was delivered by

ACCURSO, P.J.A.D.

Plaintiff Judith Frame, a realtor, listed a condominium in Stone Harbor

for short sale in 2014 for the homeowners, defendants Patrick Bastian and

Dyan Furey. Frame arranged to show the home to prospective buyers,

plaintiffs Anne Stulpin and Daniel Cifoni, her firm having previously secured

2

permission from foreclosure counsel for the mortgagee, defendant Deutsche Bank National Trust Company, as Trustee, on Behalf of the Holders of the WA-MU Pass-Through Certificates, Series 2005-AR6, to cut off the padlock on the door.  As the three were about to go inside, the deck that served as the home's entry gave way, sending plaintiffs crashing to the ground.  As they tried to scramble out of the wreckage, the home's second-story deck came away from the house and collapsed on top of them.  All three suffered serious injuries.

Plaintiffs appeal from a no-cause verdict following the liability-only trial, arguing the judge erred in declining to undertake a Hopkins[1] analysis of Deutsche Bank's duty, and that the instructions to the jury on the law of mortgagee in possession were flawed and prejudicial to them.  We agree on both points and conclude the errors led to a miscarriage of justice in this case. We thus reverse and remand for a new trial as to Deutsche Bank.  We also reverse the no-cause verdict in favor of Bastian and Furey.  Although the jury was properly instructed as to the duty a homeowner owes an invitee and determined Bastian and Furey were not negligent, that verdict was against the

---

[1]  Hopkins v. Fox & Lazlo Realtors, 132 N.J. 426 (1993).

A-1412-21

weight of the evidence. Thus, a new trial is required as to Bastian and Furey as well.

The jury was presented with the following facts. The deck collapse occurred at a condominium duplex three blocks from the beach consisting of two, two-story townhouses built in the early 1980's. Bastian and Furey bought their unit in 2004 for $750,000 with a $600,000 adjustable-rate, purchase money mortgage, eventually assigned to Deutsche Bank.[2] Their neighbor, Daniel Barish, purchased the adjoining unit the following year. These were vacation shore homes, which both families rented out in the summer, reserving a few weeks for their own use.

Bastian and Furey separated in 2008. Money got tight, and they could no longer afford their mortgage payments. They made their last payment in June 2009, and the bank instituted a foreclosure action that September. Neither Bastian nor Furey contested the foreclosure. Both testified they used the property some weekends until the bank put a padlock on the door in 2010 or 2011, along with a sticker advising it was taking control of the home to

---

[2] Bastian and Furey had another, smaller rental property they purchased for investment purposes a few blocks away on which Deutsche Bank had also been assigned the purchase money mortgage, which went into default around the same time. Bastian testified the bank padlocked that property a few months before it padlocked the subject premises.

A-1412-21

protect its asset. Both Bastian and Furey claimed they never returned after the bank locked them out, because they understood the lock to mean they were not allowed on the property. Furey testified she contacted the bank to retrieve the family's personal belongings locked inside several times but could never get anyone to listen.

Their neighbor, Barish, testified his side of the duplex, which was a mirror image of Bastian and Furey's, was also a second home for his family, where they vacationed for one week in the summer and for some weekends in the off-season. Barish testified he and his wife would wave at Bastian and Furey and communicated over issues of their shared ownership of the duplex, but the couples didn't socialize or spend time together.

Barish testified he learned in an email from Bastian that he and Furey were splitting up, and the property was headed into foreclosure. According to Barish, Bastian and Furey had stopped coming down or renting out their place by 2011, and he began to see "various stickers" on their front door. He also noted a general deterioration in the condition of the property. Although he hadn't noticed a problem with Bastian and Furey's decks, he had noticed the weeds in their yard, and that the door on the outdoor shower and those of a small storage shed were "blowing in the breeze and basically falling apart."

5

He also noticed one of the panes in the glass door leading to the upper back deck, which was accessible only from inside the unit, had broken, and there was glass all over that deck.

Questioned about his own decks, Barish testified they required regular maintenance "just being down the shore." He claimed that prior to 2013, he would stain the decks "every couple of years" and regularly replaced various rotted out "standard pine" planks with pressure treated floorboards. In 2013, a summer rental tenant complained about the condition of the decks, and Barish had a contractor come over to inspect them. Following his inspection, the contractor temporarily erected two 4x4 support posts connecting the upper and lower decks and installed lag bolts along the ledger boards connecting the decks to the house until both decks could be replaced. Those temporary support posts were still present when Bastian and Furey's decks collapsed the following spring.

Deutsche Bank's first foreclosure action was dismissed for lack of prosecution in the fall of 2013, four years after its filing on September 30, 2009. The only action the bank took to prosecute the case after filing its complaint had been a January 13, 2011 return of service and request to enter default.

A-1412-21

After responding to a call from the bank by saying he didn't own the property anymore but was only the former owner, Bastian offered the bank a deed in lieu of foreclosure, which it refused.  Bastian thereafter contacted plaintiff Judy Frame of Diller Fisher Realtors in February 2014 to list the property for a short sale in an effort to remove his and Furey's names from the title.  Bastian testified the bank had all the control and he and Furey couldn't sell the house without the bank's approval.

Frame knew the property as she was Bastian and Furey's realtor when they purchased it in 2004, and Diller Fisher had managed rentals for the couple during the years they rented it out in the summers.  Frame also testified that she'd shown the property to potential buyers in the spring or summer of 2013 before it was listed with her firm, after making an appointment with the listing broker, Brian Reed.  Frame testified Reed was well-known in the area for doing "a lot of foreclosures, a lot of short sales . . . [f]or banks."[3]

---

[3]  There are two relevant entries in the prior servicer's records relating to the bank having employed a broker to list the property after determining it vacant. On February 14, 2012, the record states:  "SHORT SALE REFER."  On June 26, 2013, there is a "Loss Mitigation Note" stating "WELCOME CALL DIALED [xxx xxx xxxx] FOR B[orrower]1[one] PATRICK J BASTIAN AND DYAN FUREY NO ANSWER - # IS DISCONNECTED CALLING TO PROVIDE CONTACT INFO FOR LIST ASSIST ASSIGNED TO ADV S[hort] S[ale] TEMP HAS BEEN OPENED."

7

Judith Frame works with her brother Stephen Frame, also a realtor at Diller Fisher. Following the listing agreement, Stephen arranged for a couple to see the property on February 28, 2014. Because he knew no one had been living there "for a long time," he took the key Diller Fisher kept for the property and walked the few blocks from his office to take a look around the day before his showing — to "make sure . . . there's no bugs in there, or, you know, there's no roof leaks or anything."

When he arrived, however, he found the property padlocked with a "Safeguard Properties" sticker on the door advising it had "found this property to be vacant," that the "mortgage holder has the right and duty to protect this property," and "if the property is NOT VACANT, please contact" the company at the phone number provided. He testified the padlock was through a latch, which had been screwed into the frame and the door. Frame returned to the office and called the number on the sticker. He spoke with someone who referred him to Deutsche Bank's foreclosure counsel. Frame called the bank's counsel and received permission to cut off the lock, which he asked Diller Fisher's handyman to do before Frame's appointment to show the house.

Richard Schneeman, the handyman, testified that after Frame called him, he drove over to the property, cut off the padlock with a pair of bolt cutters

8

and put it in his truck.  Schneeman testified he left the latch screwed into the door, and that the whole thing took about five minutes.  Frame testified he again walked over after the padlock was removed to look through the townhouse.  He entered the house using the key Diller Fisher maintained to the property.  He testified it was dusty and dirty and "just looked like, you know, somebody was living there and just never came back and never cleaned it or picked up their personal belongings."  Frame testified the couple he showed the property to was interested in purchasing it but couldn't obtain financing.

About a month later, on April 2, 2014, plaintiffs met at the property so Judith Frame could show the townhouse to Stulpin, a mortgage broker, and Cifoni, a contractor, who had teamed up to find a distressed property they could purchase, fix up and resell at a profit.  They were interested in Bastian and Furey's home because it was listed at a price $250,000 below its appraised value.

Plaintiffs testified they had only just walked up the steps and approached the front door — the only door to the townhouse — when the decks collapsed.  Frame testified she'd had the key to the door in her hand but hadn't the chance to use it before the deck gave way, throwing the three to the ground of the crawl space where they were trapped amid the debris as the second-floor deck

9

crashed down on them. She estimated they hadn't been on the deck twenty seconds before the collapse.

Plaintiffs' expert, Brian O'Donnell, a registered architect, visited the site nine days after the deck collapse before any of the debris had been removed. He testified the catastrophic collapse of both decks was caused by failure of the lower ledger board, the structural element that connects the deck joists to the house. O'Donnell explained that when the decks were built in the early 1980's, the building code would have required that the ledger board only be nailed to the house. Current codes require the ledger board to be secured by ten-to-twelve-inch lag bolts.

Bastian and Furey's ledger board failed because the nails attaching it to the house had simply rusted out, some so corroded they were reduced to the size of toothpicks, leaving them unable to hold anything. O'Donnell noted the "very extreme exposure" of the decks on the duplex from its location at the shore, "where you have high humidity, [and] you're next to a body of water," which causes "typically accelerated" deterioration from rust of the fasteners and rot of the wood.

O'Donnell testified Bastian and Furey's deck was in such an advanced state of deterioration, evident in the corroded nails and "rotted wood" making

10

up the debris pile, that it collapsed — not under typical designed load — but under the weight of three average-size people. He opined that while it would be difficult to pinpoint when the deterioration started, he could say with a reasonable degree of certainty that it had "grown exponentially" within the prior three or four years. He testified the visible rust around the nail heads and the rotted wood evident in numerous places throughout the deck during those years would have been readily apparent in any inspection and would have alerted the inspector that a further evaluation was required. Pieces of the rotted wood and the rusted nails O'Donnell had taken from the debris were entered in evidence.

Using photos taken of the duplex by Deutsche Bank's servicer during its regular inspections of Bastian and Furey's property, O'Donnell noted the temporary supports erected on the neighbors' deck in 2013, the rust around the old nail heads breaking through the paint, and the new lag screws in the neighbors' upper ledger board. He pointed out that same rusting around the nail heads was visible on the ledger board of the upper deck of Bastian and Furey's home in the photograph — and would have been readily apparent to anyone who looked up. In O'Donnell's opinion, the only real solution to the problem was replacement of the decks, but reasonable maintenance and repair

11

in the prior three or four years, similar to that performed on the neighbors' deck, which he estimated would have taken a carpenter a half day, would have likely prevented the deck collapse.

The only witness for the bank was Patrick Pittman, the litigation director for Select Portfolio Servicing, Deutsche Bank's servicer from August 2013 through trial. Pittman had no personal knowledge of the property, the servicing of the loan or the foreclosure proceedings. His testimony was based solely on his review of Select's records and those of its predecessor, J.P. Morgan Chase Bank, which serviced the loan from at least the time of the first foreclosure filing in August 2009 through July 2013. Pittman testified he regularly reviewed Select's files for depositions and trials in similar matters, and that providing such testimony was a large part of his job. He'd testified on behalf of Select in almost every state in the country.

The servicer's records revealed it had inspected Bastian and Furey's property through Safeguard, the company Select retained for "property preservation and property evaluations," forty-seven times between August 2009 and the deck collapse on April 2, 2014, meaning almost every month, and eighty-one times between the accident and the time of trial in the summer of 2021. Although Pittman referred to those inspections as "occupancy

A-1412-21

inspections," Select's documents explained "[t]he primary reasons for inspections are to determine occupancy and assess condition of the property." Plaintiffs also introduced a guide issued by Safeguard to its inspectors that proclaimed itself the servicer's "eyes and ears at their properties" by keeping them "advised of the property condition" as well as "verifying occupancy." Each of Safeguard's reports to Select from what Safeguard referred to as its "field inspections," included an assessment of the property's condition, an estimated value, the stability of the neighborhood, whether the inspector recommended any maintenance, as well as several photographs of the property capturing its exterior condition.

Pittman disputed Bastian and Furey's testimony, as well as that of Stephen Frame and Schneeman that Bastian and Furey had ever been locked out of the property prior to the accident. He claimed Select's notes "do not show . . . that there was any order for the property to . . . have the locks changed or a lock box placed on the property" at any time before the deck collapse.[4] Pittman acknowledged the testimony of those witnesses claiming to have seen a padlock and hinge drilled into the door, but claimed he was "not

_____

[4] Pittman testified Select's records reveal Safeguard, its agent, changed the lock on the only entrance to the unit and placed a lockbox on the door on September 20, 2017, three years after the accident.

able to give testimony as to the padlock and hinge lock that was found at the property" because there was nothing in Select's records to say Select ever ordered it.[5]

As for the Safeguard sticker Stephen Frame found on the door a month before the deck collapse, from which he obtained the number that led him to foreclosure counsel who gave him permission to cut off the padlock, Pittman testified "[w]e don't have within our records that this sign was posted." And he claimed if the sticker had been on the door, "it would be a part of the inspection report that we receive from Safeguard." He conceded, however, that he had "no further reason to believe" the sign was not posted.[6]

Pittman testified the only time Select would change the locks and put a lockbox on a door was if the property was found to be vacant, and Select had

---

[5] Pittman also claimed "padlocks are not used to secure primary doors" "within the mortgage industry." The Safeguard "Work Order Update" forms provided to Select documenting Safeguard's inspections, entered in evidence, however, provide the inspector a place under "Property Status" to report whether "Padlock Installed" or "Lockbox Installed." Select's records also note installation of a padlock and slide bolt at Bastian and Furey's home on September 11, 2019.

[6] Pittman also acknowledged the Safeguard reports were not always accurate. For example, the April 14, 2014 inspection report stated the property was in good condition when the pictures revealed the decks had torn away from the house and fallen into the front yard.

14

Bastian and Furey's property "flagged" as occupied at the time of the collapse. Although Pittman acknowledged that Chase serviced the mortgage prior to August 2013 using a different company for property preservation and evaluations, and that its records showed the property as vacant since October 2011, he testified "we have no record of there being a change of locks or a lock box placed on this property during this time. So, even if it was thought by the contractor to be vacant, we did not have the locks changed on this property."

Pittman further explained that even if the servicer found a property "to be vacant or thought to be vacant" and changed the locks and installed a lockbox, "it's only to protect the collateral. It is not to keep the borrowers out of the property." According to Pittman, his company only used lockboxes "to make sure that the property doesn't get vandalized. And if we find that the homeowner is still engaged in that property, then we can give them, you know, permission to go ahead and just have the locks cut off." Pittman reiterated that "we're just protecting our collateral but, because we're doing that, if the property is thought to be vacant and we re-key the property or, you know,

15

change the locks to the property and place a lock box on the property, it's not us taking ownership of the property."[7]

Pittman did not agree with plaintiffs' counsel that if Bastian and Furey were locked out of the property then they were not "occupying the property." Pittman maintained that even if the homeowners had been locked out, "if they have use of the property then it's still occupied" and not vacant. Pittman explained that while Safeguard might think a property vacant, Select can "maybe then look into our business records and see, for example, if the owner is trying to do a short sale which would mean he's still engaged in the property. So, therefore, we would consider the property occupied versus being vacant."

Pittman testified "[t]he occupancy of the property is basically what determines the next step of doing anything with the property." He explained "if the property is found to be vacant and we don't see anything within our

---

[7] Bastian and Furey's counsel challenged Pittman's assertion that Select was "not trying to lock [Bastian and Furey] out of the property," and that the only people they didn't "want to get in there are people who could vandalize the property." In addition to asking how changing the locks prevented someone from breaking a window or vandalizing a house already securely locked, counsel asked Pittman "the purpose of changing . . . has to be to prevent the person who has the key [to] the prior lock from being able to access the property, right?" After initially refusing to agree with that statement, Pittman eventually conceded that Select changing the locks on a vacant home in foreclosure "will result in the person who had the original key . . . not be[ing] able to enter the property."

business records to contradict that, then . . . the locks [can be] changed and a lock box placed on the doorknob." And, at that point should the property suffer some damage, "like a window being busted out and it's raining and, you know, water can get in there, that is something that we can fix to protect the collateral. However, it's only to protect the collateral and not for it to be seen as us taking ownership of that home."

Pittman maintained that because Bastian and Furey had listed the property with Diller Fisher for a short sale in early 2014, they were occupying the property at the time of the deck collapse. He noted it was Bastian, not Deutsche Bank, who removed the debris from the front yard and paid to have the deck rebuilt.[8] Pittman testified Bastian didn't even advise the bank the decks had collapsed until November 2014. He acknowledged, however, that Select had received an inspection report within ten days of the collapse noting

---

[8] Bastian testified he did so because the Borough had declared the premises unfit for human habitation and was threatening him with fines and penalties, and he believed he would be reimbursed by insurance. He later learned the policy he and Barish maintained on the condominium duplex did not cover decks.

N.J.S.A. 46:10B-51 imposes on a mortgagor of residential property that has become vacant after the initiation of a foreclosure proceeding, the exterior of which "is found to be a nuisance or in violation of any applicable State or local code," "the responsibility to abate the nuisance or correct the violation in the same manner and to the same extent as the title owner of the property."

the first and second floor decks had been "removed," that there was "debris present," and the "type" of "visible damage" was "neglect." He also admitted Select received the photographs identified by plaintiffs' expert showing the condition of the deck, including those of the neighbors' deck with the support posts in place and new lag bolts along the ledger board in November 2013, six months before the collapse.

But Pittman also insisted that at the time of the deck collapse, the property wasn't even in foreclosure. The first foreclosure action was dismissed for lack of prosecution on September 16, 2013, and the second case, which was also uncontested, wasn't filed until May 11, 2015. Pittman was forced to concede on cross-examination, however, that at the time of the collapse, Deutsche Bank had a motion pending to reinstate its first complaint that was not decided until May 1, 2013, several weeks after the collapse. Pittman acknowledged the bank continued to pay the property taxes between the two actions, as it had since the loan went into default in 2009.

Pittman also acknowledged that although Deutsche Bank had started its foreclosure in August 2009, and finally gotten an uncontested final judgment in August 2018, it had still not taken the property to sheriff's sale at the time of trial in July 2021. Asked why, Pittman testified it was Select's policy on

18

behalf of Deutsche Bank not to "follow a foreclosure all the way through if there's a pending lawsuit from the homeowner."

Pittman acknowledged that this lawsuit was filed by plaintiffs injured in the deck collapse, not Bastian and Furey. He also agreed with plaintiffs' counsel that plaintiffs "are innocent victims [who] didn't do anything at all to cause that deck to collapse other than walk[] on it" and did nothing "improper or unreasonable." He further agreed with plaintiffs' counsel that because the deck was in such poor condition that it collapsed under the weight of "three average size people" that it was "a threat to the health and safety of individuals using the deck." But he insisted the bank bore no responsibility "to make sure that deck was reasonably safe for its intended use," that the bank "played no role and ha[d] no responsibility whatsoever for the collapse of that deck," and that the entire "responsibility would lie with the owner of the property at that time."

Plaintiffs' counsel asked Pittman if someone tomorrow were "walking down the sidewalk and a loose tile blows off the roof" and "strikes someone in the eye," would the bank take the position that it is not responsible and the entire fault rests with Bastian and Furey, notwithstanding the bank admitted

19

the property had been vacant since 2017 when it changed the locks.[9] Pittman declined to speculate. He maintained his position that Deutsche Bank bore no responsibility for the deck collapse. "[T]his was not a property that was owned and is still not owned by [Select] or by Deutsche Bank as this has not gone all the way through the foreclosure process for us to be able to receive a deed from the sheriff. This was still and is still to this day owned by the homeowners."

The judge denied the bank's motion for involuntary dismissal under Rule 4:37-2(b) and for judgment under Rule 4:40-1 but agreed he would instruct the jury on the law as to mortgagee in possession only. Finding the "Appellate Division has made it clear over and over and over again that it's not going to expand the reach of the Hopkins decision," the judge granted the bank's request that he not consider whether Deutsche Bank owed plaintiffs a duty under a Hopkins analysis as plaintiffs had requested.

---

[9] Plaintiffs' counsel put another hypothetical to Pittman, asking what the Bank would do if a home were still occupied as Select defined it and an inspector saw a big light "hanging by a thread, but it's sparking. There's sparks coming out and there's a concern that [it] could set the whole house on fire." Pittman replied that he didn't know "whether we would reach out directly to the homeowner or we would see if we can cure that situation because it is such a hazard. But, again, because we're not the homeowner, there is only so much that we can do."

A-1412-21

Although plaintiffs' counsel initially contended at the charge conference that the jury could assign liability to both Deutsche Bank and the homeowners, he eventually agreed with the judge and bank's counsel that the jury should be instructed that either Bastian and Furey or Deutsch Bank were in possession of the property and thus owed a duty to plaintiffs. In other words, the jury would be instructed that either Deutsche Bank or Bastian and Furey was in possession of the property and owed a duty to plaintiffs, but not both.

Ultimately, plaintiffs' counsel asked the judge to remove the judge's proposed instruction that "[p]laintiffs assert that the homeowners, Patrick Bastian and Diane Furey are responsible for the deck collapse," asserting plaintiffs had "never asserted that" in their "opening statement" or their proofs at trial. In light of Deutsch Bank's crossclaim against Bastian and Furey, all counsel agreed with the court's ultimate instruction that:

> There are two parties, either one of which could be found responsible for the deck. Plaintiffs assert that defendant, Deutsche Bank . . . was responsible for the deck. . . . Defendant, Deutsche Bank, asserts that the title holders, Patrick Bastian and Diane Furey, were responsible for the deck. I want you to understand that the law does not allow for both the property owner or the title holder and the mortgage company to be liable in this case. Your verdict will be that neither is liable or that one or the other is liable. But, again, you cannot find that both are liable.

21

There was considerable disagreement over the mortgagee in possession charge. The judge's draft charge included a list of factors from reported cases that courts had considered indicative, or not, of the mortgagee having taken management and control of the property from the homeowners to become a mortgagee in possession. Plaintiffs' counsel and counsel for Bastian and Furey objected that the list was prejudicial as some factors included, such as the mortgagee renting out the property, were not at issue in the case, and that a list undercut the court's instruction that whether the bank had become a mortgagee in possession had to be determined on a case-by-case basis.

Bank's counsel argued the list should be more extensive and include factors found dispositive in unreported cases. The judge expressed concern that if he did not list factors for the jury to consider, "[t]hey could get back there and just say, they put a lock on the door, that's enough period. I think I have to instruct them that that's not enough because that's what our case law says."

The judge charged the jury:

> In 2009, Bastian and Furey defaulted on the mortgage. Deutsche Bank began the foreclosure process. The issue you have to decide is whether or not Bastian and Furey were in possession of the property as of April 2nd, 2014 [the date of the collapse]. Or if Deutsche Bank took possession of the

22

property away from Bastian and Furey as of that date. One of them was in possession of the property. It is up to you to decide which.

I think we can all understand that a title holder is usually in possession of their property. Sometimes, however, the title holder might not be in possession of the property because they abandoned or vacated the property and the mortgage company took possession of the property. In that case, the mortgage company becomes a mortgagee in possession — a mortgagee in possession of the property.

The term possession as I am using it here is not necessarily what possession may commonly mean to you. I am going to tell you the law as to when a mortgage holder goes from being just a mortgage holder to being a mortgage holder in possession of the property.

When a mortgage holder is in possession is determined on a case-by-case basis. The acts of a mortgage holder under the circumstances determine whether or not control and management of the premises have been undertaken by the mortgagee.

When the mortgage holder takes out of the hands of the owner the management and control of the property, the mortgage holder becomes a mortgage holder in possession. Control and management include elements of possession, operation, maintenance, use, repair and control of the property. Dominion and control over the property are more descriptive of a mortgagee in possession, not actual possession. The possession may be either actual or constructive.

A-1412-21

The plaintiffs must prove by a preponderance of the evidence that as of the date of the incident, the mortgage holder, Deutsche Bank, had taken control and management of the property out of the hands of Mr. Bastian and Ms. Furey.  Factors that you are to consider in determining management and control of a property by a mortgage holder include possessing, operating, maintaining, using, repairing and controlling the property.  It is not enough that the mortgage holder took steps to protect its collateral.

For instance, our courts have ruled that changing locks on the property, winterizing the property and paying the taxes and insurance on the property are acts of protecting collateral and by themselves are not indicia of taking possession.  If you find that the only actions taken by Deutsche Bank were minimal actions to protect its collateral, then you must find that Deutsche Bank did not take possession of the property from Bastian and Furey.

On the other hand, it is enough that the mortgage holder exercised management and control of the property.  For instance, our courts have ruled that a mortgage holder who rents the property and collects rents has exercised management and control.  If you find that Deutsche Bank exercised management and control of the property, you must find that Deutsche Bank did take possession of the property from Bastian and Furey.

I have offered you some examples of what our courts have found in other cases were factors to consider in the analysis of whether or not management and control has been exercised by a mortgage holder.  I offer these examples as just that, examples.  They are not intended to limit or constrain you in any way.  In this case, you can consider those factors and you can

consider other factors also. Other factors that you believe the evidence in this case supports. You heard in closing arguments counsel suggest to you factors you should consider. You are free to consider those factors or to reject those factors.

At plaintiffs' request, the judge also delivered the standard res ipsa loquitur charge informing the jury the collapse of the deck was not something that would ordinarily occur in the absence of negligence.

The first question on the verdict sheet was: "Do you find by a preponderance of the evidence that as of April 2, 2014, defendant Deutsche Bank had taken management and control of the property from the owners, Mr. Bastian and Ms. Furey?" The jury answered "no" to that question by a vote of seven to one. The jury proceeded to Question No. 4 as instructed: "Do you find, by a preponderance of the evidence, that defendants Patrick Bastian and Dyan Furey were negligent with respect to the deck?" The jury answered that question in the negative as well, by a vote of eight to zero. The judge entered an order for judgment for defendants.

Plaintiffs made a motion for a new trial, reiterating their arguments that the court erred in refusing to undertake a Hopkins analysis of Deutsche Bank's duty and that the jury instruction on mortgagee in possession was flawed.

They also argued the verdict was against the weight of the evidence. The judge denied the motion in a written statement of reasons.

Turning first to the jury instruction, the judge found New Jersey law on mortgagee in possession "has been clear for 80 years," that is, since Scott v. The Hoboken Bank for Savings, 126 N.J.L. 294 (Sup. Ct. 1941), aff'd o.b. 127 N.J.L. 564 (E. & A. 1942), that "[i]t is only when the mortgagee forces the owner out of the management and control of the property that the mortgagee becomes a 'mortgagee in possession,' responsible to third parties for the upkeep of the property." Looking to our recent decision in Woodlands Community Association, Inc. v. Mitchell, 450 N.J. Super. 310, 315 (App. Div. 2017), the judge found "[r]enting out a property and collecting rents are sufficient factors to establish mortgagee in possession status," but "changing the locks, winterizing the property, paying insurance and . . . real estate taxes are all not sufficient to establish mortgagee in possession status."

The judge rejected plaintiffs' claims that the phrase "management and control" had little meaning in the context of the case,[10] and that including the

---

[10] During deliberations, the jury requested the judge to explain the meaning of "management and control" and asked for a dictionary to assist them. The judge re-read that part of the instructions and denied the request for a dictionary.

A-1412-21

collection of rents as the only example of what could constitute the actions of a mortgagee in possession improperly led the jury to conclude the actions undertaken by Deutsche Bank "could not be considered to determine whether or not [Deutsche Bank] was a mortgagee-in-possession." The judge found the jury instruction was crafted based on existing case law and accurately reflected "the current state of the law on a mortgagee-in-possession," including that the mortgagee's status must be determined on a case-by-case basis.

The judge also rejected plaintiffs' argument that the Hopkins factors would support imposition of a duty on the bank to plaintiffs even if it would not qualify as a mortgagee in possession under a traditional analysis, given the advanced state of deterioration of the deck, and that the bank "was the only party to have been present on and to have inspected the property for years prior to the incident." He found our courts have limited a mortgagee's tort liability to third parties to those mortgagees in possession assuming management and control over the mortgaged premises and there is no indication "our courts would extend liability to a mortgage company that is not a mortgagee-in-possession." The judge further found that "our appellate courts have had the opportunity to expand Hopkins, and have declined to do so, maintaining its

27

narrow holding," and that he had "appropriately declined to extend" the holding in <u>Hopkins</u> to this case.

Finally, the judge rejected plaintiffs' argument that a "finding that no one was responsible for the dangerous and unsafe condition of the decks" was against the weight of the evidence and constituted a miscarriage of justice. In considering whether the verdict was against the weight of the evidence, the judge acknowledged that

> [b]y deciding in Question No. 1 that [Deutsche Bank] was not in possession of the property, the jury necessarily also decided that Bastian and Furey were in possession of the property, and therefore had the duty to maintain the property in a reasonably safe fashion. The jury then unanimously decided in Question No. 4 that, by a preponderance of the evidence, Bastian and Furey were not negligent with respect to the deck.

The judge found the evidence was uncontroverted "that neither Bastian nor Furey knew of a hazardous condition, and neither were advised of any hazardous condition by any party who was at the premises in the years and days leading up to the accident." He also noted "Bastian and Furey presented evidence and argued to the jury" that it was not reasonable for them to have "undertake[n] an inspection of the deck under the circumstances."

28

The judge noted the inference of negligence under the res ipsa loquitor doctrine is a permissive one and "[t]he jury could have determined that the homeowners did exercise reasonable care under the circumstances, because it could have simply rejected plaintiffs' expert's opinion that a homeowner has a duty to inspect decks on a regular basis." Indeed, the judge found the "expert's testimony that a homeowner has a duty to inspect their deck was simply not credible."

According to the judge, "[m]any people in Cape May County own homes with decks" and "[v]ery few if any inspect their decks on a regular basis." The judge further found that homeowners wouldn't even know what to look for if they did inspect. Although acknowledging that a homeowner "might look at the deck boards [to] see if they are splitting or cracking, but most would not know to crawl under the deck and look for damaged or rusted fasteners at the ledger board, which was the alleged cause of this deck collapse." In addition, the judge found "[i]t was within the jury's prerogative to determine that no inspection on the part of Bastian and Furey would have revealed that there was a likelihood of the deck collapsing," noting "the numerous inspections of the property that had been undertaken by [Deutsche Bank] as well as the fact that

Steven Frame, a real estate broker, had been on the deck just days prior to the collapse."

Finally, the judge found plaintiffs "made a decision to pursue this case against [Deutsche Bank], and not against" Bastian and Furey, with plaintiffs' counsel stating in his summation that "[t]here has not been evidence in this case sufficient to hold [Bastian and Furey] responsible." The judge found because counsel, essentially, "told the jury how to answer jury question number four," plaintiffs' assertion that the verdict was against the weight of the evidence and a miscarriage of justice is "simply not consistent with the position taken by plaintiffs at trial."

Although it is axiomatic that a jury verdict is to be accorded considerable deference, Rule 4:49-1(a) commands that "[t]he trial judge shall grant the motion [for a new trial] if, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a miscarriage of justice under the law." We review decisions on motions for a new trial using the same standard. Hayes v. Delamotte, 231 N.J. 373, 386 (2018).

Our Supreme Court has described a "miscarriage of justice" as that "pervading sense of 'wrongness'" existing "in the reviewing mind" resulting in

30

"a definite conviction that [the jury] went so wide of the mark, a mistake must have been made." Baxter v. Fairmont Food Co., 74 N.J. 588, 599 (1977) (quoting State v. Johnson, 42 N.J. 146, 162 (1964)). The Court has held "[t]his sense of 'wrongness' can arise in numerous ways," among them "a manifest lack of inherently credible evidence to support the finding, obvious overlooking or under-evaluation of crucial evidence, [or] a clearly unjust result." Johnson, 42 N.J. at 162.

In our minds, this case falls into the last category. Plaintiffs were business invitees to a home in foreclosure listed for short sale by the homeowners, to which plaintiffs could only gain access after receiving permission from the mortgagee's foreclosure counsel to cut the padlock off the only door. Both defendants agreed the deck plaintiffs had to cross to enter the home was unsafe and collapsed without any fault on their part. Both also agreed that "someone" owed plaintiffs a duty to maintain the deck in a safe condition, and that duty was obviously breached. They disagreed only on which one of them was responsible for the deck's collapse, each claiming the other breached their duty to plaintiffs. Yet the jury, forced to choose between them, decided neither was liable for the deck's collapse, leaving plaintiffs with no recovery. Because that result leaves us with a "pervading sense of

31

'wrongness'" for reasons we explain, we reverse the order denying plaintiffs' motion for a new trial.

"The common law in New Jersey holds that a mortgagee is entitled to possession of mortgaged premises on default of the loan secured by the mortgage." Chase Manhattan Bank v. Josephson, 135 N.J. 209, 217 (1994). "[P]rior to default, a mortgagor has the exclusive right of possession and all of the incidents related thereto." McCorristin v. Salmon Signs, 244 N.J. Super. 503, 508 (App. Div. 1990). The mortgagor "is the owner of the land and has the right to receive the rents, issues and profits." City Fed. Sav. & Loan Ass'n v. Jacobs, 188 N.J. Super. 482, 486 (App. Div. 1983). "Once the mortgagor defaults in performance, the mortgagee has the right of possession subject to the owner's equity of redemption." Ibid. Thus, on default, the mortgagee has the right to take over possession and collect any rents to defray his mortgage, for which he must account to the mortgagor on redemption. Stewart v. Fairchild-Baldwin Co., 91 N.J. Eq. 86, 89 (1919).[11]

_____

[11] Taking possession of the mortgaged premises is not the only way for a mortgagee to obtain the rents on the mortgagor's default, however. A mortgagee with an assignment of the rents conditioned on default acquires title to the rents on default independent of its rights as a mortgagee. Stanton v. Metro. Lumber Co., 107 N.J. Eq. 345, 347-48 (Ch. 1930). See also Int'l Bus. Machines Corp. v. Axinn, 290 N.J. Super. 564, 568 (App. Div. 1996) (citing In

Of course, "[t]he mortgagee is not required to assert his right to possession." City Fed., 188 N.J. Super. at 482, 486. He must take "affirmative action" to do so. Ibid. The mortgagee can take possession in a variety of ways, including by self-help after abandonment. See Briglia v. Mondrian Mortg. Corp., 304 N.J. Super. 77, 79-80 (App. Div. 1997) (finding the mortgagee in possession of single-family home following the owner's abandonment after its "agent secured the property by changing the locks, disconnecting the water meter, blowing out the water pipes with compressed air, and discontinuing the heat and electric services"); 30 Law of Mortgages N.J. Practice § 21.4 (Myron C. Weinstein) (2d ed. 2000) (noting "mortgagee's so-called 'self-help' remedy . . . is especially useful when property has been abandoned"). Although it is well-settled that entry by the mortgagee after default "requires publicity," Cohn v. Plass, 85 N.J. Eq. 153, 160 (E. & A. 1915), opinion modified on reh'g, 100 A. 327 (E. & A. 1917), a public declaration is insufficient to establish possession; it "must be followed by

re Jason Realty, L.P., 59 F.3d 423, 430, n. 3 (3d Cir. 1995)) ("recognizing the so-called New Jersey rule pursuant to which a mortgagee with an assignment of rents is entitled to enforce the assignment and collect the rents without either taking possession of the property or seeking appointment of a receiver").

something which amounts to an ouster of or surrender of possession by the mortgagor," Hands v. Russell, 115 N.J. Eq. 55, 57 (Ch. 1933).

The trial court looked to Scott v. Hoboken Bank for Savings for its instruction to the jury on mortgagee in possession, and we agree it's authoritative. Scott was the bank's appeal of a jury award to Mildred Scott for injuries she sustained "as a result of a fall caused by the neglectful maintenance of a common stairway in the house in which she lived." 126 N.J.L. at 295. The bank contended the evidence was inadequate to establish its liability to Scott as a mortgagee in possession as a matter of law. Ibid. The former supreme court disagreed.

Scott "was a month to month tenant of the third floor of a flat" in Hoboken. Ibid. The owners, husband and wife who also lived in the building, conveyed the property to their closely held corporation subject to the mortgage they'd given the bank. Ibid. That mortgage was in default and the building in need of repairs. Ibid. The corporation entered into an agreement with the bank assigning it the rents and giving it "power of 'entry and distress;' complete authority to collect rents and to sue for same . . . in the name of the corporate owner for the use of the mortgagee or in its own name as assignee; and to dispossess tenants for non-payment of rent." Ibid.

The agreement also empowered the mortgagee to reduce the rents "as agent _of the owner_," and to use those rents "'[t]o pay the necessary running expenses,'" including the sums due on the mortgage as well as taxes and insurance. Ibid. (emphasis in original). "The mortgagee was empowered to 'make such repairs, alterations and improvements to the premises' as in its discretion might seem advantageous," with the costs paid by the mortgagee "in behalf of the owner; reimbursement to follow from the rents collected." Id. at 295-96. Finally, the agreement provided the mortgagee "'may appoint an agent for the collection of rents and the management of said premises, but such agent _shall be the agent of the [owner]_'" and appointed the mortgagee the owner's attorney in fact "to enable it 'more efficiently to carry out its duties as assignee.'" Id. at 296 (emphasis in original). The bank appointed an agent to manage the property and directed the tenants to make their rent payments to him, which Scott thereafter did. Ibid.

On appeal, the bank argued the trial court should have directed a verdict in its favor because it acted as an "agent of the owner and was not a mortgagee in possession or landlord in fact." Ibid. The bank contended the efforts the agent made to collect rents and maintain the property, including inspecting the staircase at least weekly and repairing it after the accident, were undertaken

pursuant to its assignment as the agent of the owner in accord with the controlling agreement. Ibid.

Scott pointed to the evidence adduced at trial "that the owner had no voice or control in the management of the property" after execution of the assignment agreement, including that the owner remained a tenant and paid rent to the agent and that, by all appearances, the agent acted on behalf of the bank. Scott testified she'd asked the agent to repair the staircase prior to her fall and was told he'd take the matter up with the bank. Id. at 297-98. Scott also testified that she at one time "sought the position of janitress of the premises and that it was the mortgagee's representative, a bank official, who passed on her qualifications and decided that such work should be done by a man rather than a woman." Id. at 297.

The court found the evidence supported the jury's finding "that the bank was in possession and exercised control and management of the premises," rejecting its contention that the agreement was "controlling proof" that it acted as the owner's agent and not as a mortgagee in possession. Ibid. The court found the assignment agreement was not binding on Scott, "regardless of its control over the parties who executed it." It held the "plaintiff was entitled to consider the whole situation objectively," and that it is "the acts of a

36

mortgagee under the circumstances" that "determine whether or not possession and management of the premises have been undertaken by the mortgagee." The court stressed "[i]t is a fact issue" for the jury, "the assignment agreement being some evidence, just as any other pertinent exhibit might be, in support of the defendant's position." Id. at 298.

Noting there was no controlling New Jersey law on the issue, the court adopted as "applicable and sound," the opinion of the "text-writers" that "'the mere fact that a mortgagee receives the rents and properties does not constitute him a mortgagee in possession, unless he takes the rents in such a way as to take out of the hands of the mortgagor the management and control of the estate.'" Ibid. (quoting 41 C.J.S. Mortgages § 580, p. 613). The court found the evidence sufficient for the jury to have concluded the bank "did in fact enter upon management of the house to the exclusion of the owner . . . answerable for improvident or negligent management," and "for its torts," as — having gone into possession — it assumed "all the duties which burden an owner." Id. at 298.

The Chief Justice, writing in Scott for the old supreme court, distinguished an earlier case by the court of Errors and Appeals, Rizzi v. Ross, 117 N.J.L. 362 (E. & A. 1937), which had reversed a directed verdict for the

37

owner at the close of the plaintiff's case based on an assignment agreement similar to the one in Scott, including the appointment of an agent of the owner, selected by the mortgagee, to manage the property and collect the rents. The agreements differed in that the owner's agreement with the mortgagee in Rizzi, reserved to the owner the right to veto "substantial repairs" to the building. 117 N.J.L. at 363.

Rizzi, the plaintiff, had sued only the owner of the apartment building, Ross, for injuries Rizzi suffered standing on the third-floor platform of an outside staircase when "the entire stairway from that point down parted from the building and sank to the ground." Id. at 365. The Rizzi Court acknowledged the agreement between the owner and its mortgagee was structured "to give the mortgagee some of the advantages and to shield it from some of the disadvantages it would have by going into possession," and that whether the repairs were or were not substantial was a fact question for the jury. Id. at 364.

It also acknowledged that the parties did not dispute "that the duty to make the repairs rested upon the person who stood in the owner's shoes in respect of that duty." Id. at 366. But the Court found that "whether the required repairs were slight or substantial, the ultimate liability must lie

somewhere," and that "[i]t is the duty of an owner to use reasonable care to see that such portions of the general premises of an apartment property as are reserved to him for his care, preservation and repair are reasonably safe for the use of the tenants and those who are impliedly invited to come upon them; and that duty cannot be delegated or transferred." Id. at 365-66.

The Chief Justice rejected the mortgagee's argument in Scott that Rizzi was "apt authority," finding in Scott there was proof, "in contravention of" the assignment, "from which the jury might well conclude that the assignee had in fact assumed complete control over the premises," not only "as to the collection of rents and payment of bills but also as to the making of repairs and that the owner, in the position of a rent paying tenant, had no control." Scott, 126 N.J.L. at 298-99. Although recognizing "the well established rule that an owner may not unburden himself of the duty owed to tenants to keep the common ways and equipment of a multiple dwelling reasonably safe," the Scott court held the "rule does not at all mean that another, such as here a mortgagee, may not by assuming control and management render himself liable for negligence in the matter which he had undertaken." Id. at 299.

The lesson to be drawn from Scott, and its rejection of Rizzi as controlling there, is that a plaintiff suing in a case like this is "entitled to

consider the whole situation objectively," and that it is "the acts of a mortgagee under the circumstances," not how the mortgagee characterizes them, that "determine whether or not possession and management of the premises have been undertaken by the mortgagee." Id. at 298. The lesson is borne out in later cases. See Briglia, 304 N.J. Super. at 79-80 (finding a mortgagee in possession of single-family home following the owner's abandonment after the mortgagee's agent changed the locks and winterized the property making it uninhabitable); Woodview Condo. Ass'n, Inc. v. Shanahan, 391 N.J. Super. 170, 174 (App. Div. 2007) (holding a mortgagee who entered into a management agreement and took possession of two condominium units after the mortgagor's default, subsequently renting out both units, was liable for condominium assessments as of the date of possession); Woodlands Cmty. Ass'n, Inc. v. Mitchell, 450 N.J. Super. 310, 314 (App. Div. 2017) (holding the mortgagee's assignee's changing the locks and winterizing condominium unit was not enough to make it a mortgagee in possession responsible for condominium fees). The law in each case is the same; the outcomes are different because the factors play differently under different circumstances.

We agree with plaintiffs that the trial court's charge on mortgagee in possession misstated the law. The judge instructed the jury, correctly, that

40

whether a bank has become a mortgagee in possession "is determined on a case-by-case basis" and that it's "[t]he acts of a mortgage holder under the circumstances" that control. We also agree with the instruction that "[d]ominion and control over the property are more descriptive of a mortgagee in possession" than what the jury might ordinarily understand the word "possession" to mean. See Woodlands, 450 N.J. Super. at 316; 30 Weinstein, § 21.10, at 132 (citing George E. Osborne, Handbook on the Law of Mortgages § 162 (2d ed. 1970)) ("[A]s Osborne points out, the word 'possession' is somewhat misleading; 'dominion and control' is really more descriptive"). See also Osborne, § 162, at 283 ("for a mortgagee to become a mortgagee in possession he must have possession of the premises qua mortgagee. What constitutes such occupation qua mortgagee varies with the nature and condition of the property.").

But telling the jury it was to determine whether the mortgagee had taken management and control of the property by considering specific factors, namely "possessing, operating, maintaining, using, repairing and controlling the property," which it could not readily apply to the facts; that it was "not enough [to establish possession] that the mortgage holder took steps to protect its collateral"; "that changing locks on the property, winterizing the property

41

and paying the taxes and insurance . . . are acts of protecting collateral and by themselves are not indicia of taking possession"; and that our courts have found a mortgagor's having collecting rents "is enough to establish management and control of the property" was not consistent with the case law and constituted prejudicial error to plaintiffs. See Comprehensive Neurosurgical, P.C. v. Valley Hosp., 257 N.J. 33, 74-75 (2024) (reiterating that appropriate and proper jury instructions are essential to a fair trial).

The problem with the charge is it's the mortgagee's acts "under the circumstances" that determine whether it has taken "complete control over the premises" from the title holder leaving him "no voice or control in the management of the property." Scott, 126 N.J.L. at 297-99 (emphasis added). Contrary to the judge's charge, this court has found a mortgagee who secured a single-family home after the owner abandoned it "by changing the locks, disconnecting the water meter, blowing out the water pipes with compressed air, and discontinuing the heat and electric services," had become a mortgagee in possession, Briglia, 304 N.J. Super. at 79-80. And Scott stands for the proposition that "the mere fact that a mortgagee receives the rents . . . does not constitute him a mortgagee in possession unless he takes the rents in such a way as to take out of the hands of the mortgagor the management and control

of the estate." Scott, 126 N.J.L. at 298 (quoting 41 C.J.S. Mortgages § 580, p. 613).

In our view, the court overread Woodlands, deeming the factors we found controlling of the outcome in that case as factors controlling in every case. The lesson of Scott, however, is to the contrary. There is no single controlling factor or list of factors. A plaintiff is entitled to have the jury assess "the acts of a mortgagee under the circumstances" as they existed at the time, "consider[ing] the whole situation objectively." Ibid.

It is incumbent on the trial judge to explain to the jury "the applicable legal principles and how they are to be applied in light of the parties' contentions and evidence produced in the case." Est. of Kotsovska ex rel. Kotsovska v. Liebman, 221 N.J. 568, 591 (2015) (quoting Viscik v. Fowler Equip. Co., 173 N.J. 1, 18 (2002)). Here, the jury should have been instructed it needed to decide whether Deutsche Bank had taken "dominion and control" of the Stone Harbor property leaving Bastian and Furey with "no voice or control," by considering "the whole situation" in light of the parties' contentions and the evidence they adduced at trial.[12]

---

[12] "Management" is not often used in the context of a single-family home, as opposed to a multi-family dwelling. We agree with Osborne that "possession"

The judge should have summarized defendants' respective positions: Bastian and Furey claiming Deutsche Bank padlocked and placed a sticker on the only door in 2011 after serving them with a foreclosure complaint two years earlier, that they took the padlock to mean they were no longer allowed on the premises, their failure to return after finding the house padlocked, their unsuccessful attempts to retrieve their personal belongings from the bank, the notes in the servicer's records from 2012 and 2013 that the bank retained a realtor to list the house for short sale, and the bank having inspected the property forty-seven times between 2009 and the date of the collapse; and Deutsche Bank's position that it never changed the locks on the property before the deck collapsed as the servicer's records reflected it was occupied, not vacant, that the bank never padlocks a front door, that the inspections it undertook were for the purpose of determining occupancy only, that it was Bastian and Furey who maintained insurance on the property and listed it for short sale with Diller Fisher, that it was Bastian who cleared the debris and rebuilt the decks after the collapse, and that even if the bank had changed the locks and put a lockbox on the property, which it did not do, it would have

"varies with the nature and condition of the property" and should be reflected in the charge accordingly.

only done so to protect its collateral and not to oust Bastian and Furey from possession and control.

The jury should not have been instructed that "[i]t is not enough [to establish possession in the mortgagee] that the mortgage holder took steps to protect its collateral." As Scott teaches, it is "the acts of a mortgagee under the circumstances," not what motivated the mortgagee to undertake them or how it decides to characterize them at trial, that "determine whether or not" it has assumed dominion and control over the premises. 126 N.J.L. at 298. The bank is, of course, free to argue that it took only the steps necessary to protect its collateral. But the jury should be instructed that although the bank may take steps to preserve its collateral, if, under the circumstances, those steps amount to stripping the titleholders of all control and dominion, the bank will be deemed to be a mortgagee in possession.

Finally on this point, we note we do not share the trial judge's concern that without a list of factors deemed dispositive in other cases, the jury "could get back there and just say, they put a lock on the door, that's enough period," when "that's not enough because that's what our case law says."

The point to bear in mind is that "the acts of a mortgagee under the circumstances, determine whether or not possession and management of the

45

premises have been undertaken by the mortgagee. It is a fact issue" for the jury. Ibid. As already noted, no single factor or list of factors is determinative. A fact or facts sufficient to establish dominion and control under one set of circumstances may be insufficient to establish it under another. Once properly instructed on the law, the determination of whether the mortgagee's actions amounted to dominion and control of the property to the exclusion of the owner is for the jury. Because the charge failed to adequately convey the law on mortgagee in possession to the jury, we reverse the liability verdict in favor of Deutsche Bank. See Mogull v. CB Com. Real Est. Grp., Inc., 162 N.J. 449, 464 (2000).

We turn to consider whether the trial court erred in refusing plaintiffs' request to consider whether Deutsche Bank owed them a duty of care apart from the duty it would owe were it determined to be a mortgagee in possession. Although the theory is a novel one, we conclude the court erred in refusing to consider the question.

The court viewed plaintiffs' request as one to "expand the reach of the Hopkins decision," to "extend liability [to third parties] to a mortgage company that is not a mortgagee-in-possession." Although we acknowledge that certainly was plaintiffs' goal, we view the request differently. As we

46

understand it, plaintiffs were acknowledging that Deutsche Bank's actions in padlocking what it perceived to be a vacant property, assuming that's what happened, might not be sufficient to qualify it as a mortgagee in possession, thereby failing to supply plaintiffs with the basis for a cause of action against the bank. Plaintiffs were thus asking the court to "engage in the traditional, comprehensive analysis of whether a duty is owed" to determine whether the bank otherwise owed them a duty of care. Est. of Desir ex rel. Estiverne v. Vertus, 214 N.J. 303, 322 (2013). Leaving aside what the result might have been, we see no principled reason for the court to have refused plaintiffs' request to undertake the analysis.

It is no secret that mortgagees often take pains to avoid taking possession of non-income producing residential properties because of the obligations and potential liabilities such possession would impose. See 30 Weinstein, § 27B.1 ("Mortgagees in most cases don't want to take possession because of the responsibilities, duties and potential liability that attaches when a mortgagee becomes a mortgagee in possession.") And, as the bank points out, a mortgagor should not be allowed, "simply by choosing to ignore his own duties to care for the property," to unilaterally shift liability to the mortgagee.

Nevertheless, the bank did not dispute at trial that by 2014, five years after it filed its foreclosure, the deck had fallen into such a state of disrepair that it posed a threat of imminent harm to anyone attempting to enter the home. The bank also failed to refute the testimony of plaintiffs' expert that the deck's advanced state of deterioration would have been readily apparent three to four years before its collapse. The question plaintiffs pose, well-illustrated by the hypotheticals their counsel put to the bank's witness, is whether a mortgagee not in possession that fails to timely prosecute its foreclosure through sale, becomes liable, along with the owner, for injuries to third parties entering the premises caused by failure to maintain the property.

As our Supreme Court explained in <u>Hopkins</u>,

> [w]hether a person owes a duty of reasonable care toward another turns on whether the imposition of such a duty satisfies an abiding sense of basic fairness under all of the circumstances in light of considerations of public policy. That inquiry involves identifying, weighing, and balancing several factors — the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution. The analysis is both very fact-specific and principled; it must lead to solutions that properly and fairly resolve the specific case and generate intelligible and sensible rules to govern future conduct.
>
> [132 N.J. at 439 (citing <u>Goldberg v. Housing Auth.</u>, 38 N.J. 578, 583 (1962)).]

In 2017, the Chief Justice established a Special Committee on Residential Foreclosures that issued a series of recommended changes to the laws and court rules geared to ensuring foreclosures proceed in a more timely manner, acknowledging that "lingering foreclosures depress property values, burden municipalities," and that "[v]acant and abandoned properties — sometimes called 'zombie foreclosures'[13] —" "detract from New Jersey's communities and cause economic and safety risks that undermine quality of life."[14]  Admin. Off. Cts., N.J. Judiciary, Reporting of the Special Committee on Residential Foreclosures 4-9 (2018).  Acting on the committee's recommendations, the Legislature passed a bi-partisan series of bills in 2019,

---

[13] One commentator has defined the term "zombie mortgage" as "a mortgage on a residential property for which enforcement of foreclosure proceedings were commenced but never finalized," resulting in the mortgagors believing "they have lost ownership of the mortgaged property, but they are in fact still the legal owners of record several years later."  The author claims "zombie mortgages result from a series of lender-created scenarios, all which serve to maintain legal ownership and liability of the property in a borrower."  Andrea Clark, Amidst the Walking Dead: Judicial and Nonjudicial Approaches for Eradicating Zombie Mortgages, 65 Emory L.J. 795, 800 (2016).

[14] Deutsche Bank acknowledged at trial in 2021 that it had obtained a final judgment of foreclosure in 2019 but had not taken the property to sale and received a deed from the sheriff.  Thus, title remained in Bastian and Furey ten years after they vacated the premises and twelve years after the bank filed its first complaint to foreclose the mortgage.

which, among other things, shortened one measure of the statute of limitations for residential mortgages covered by the Fair Foreclosure Act, N.J.S.A. 2A:50-53 to -82, to six years from the date of default, L. 2019, c. 67, limited the number of times a foreclosure complaint can be reinstated, id., set deadlines for the conduct of sheriff sales, L. 2019, c. 71-72, and authorized municipalities to adopt ordinances regulating the care, maintenance, security, and upkeep of the exterior of vacant and abandoned residential properties in foreclosure, L. 2019, c. 66.

The deterioration of residential properties languishing in foreclosure has obviously become a matter of public concern for all three branches of New Jersey's government. The steps the Legislature has taken to combat it may effectively address the problem, making the creation of a new common law duty on mortgage holders of vacant or abandoned properties failing to promptly proceed to sheriff sale unwise and unnecessary.[15] We are also, of course, mindful of the Court's admonition in Desir that "the function of the

_____

[15] But see Weinstein, Taming the Dreaded New Six Year Limitation Period for Residential Mortgage Foreclosures, 227 N.J.L.J. 1087 (April 26, 2021) arguing a mortgagee could salvage a foreclosure barred by the new six-year statute of limitations by pursuing its statutory twenty-year right of possession, N.J.S.A. 2A:14-6 and 7. Of course, doing so would require the mortgagee to assume the responsibilities of the owner to third parties.

common law is not to achieve a result in a particular case, but to establish generally applicable rules to govern societal behaviors." 214 N.J. at 323.

As the court declined to a undertake a full-duty analysis in the first instance, the parties' arguments on this point are not well-honed, and they have had no opportunity to address some of the issues we have raised. As it would be both unfair to the parties, and unwise on less than a full record, to undertake the analysis ourselves, we direct the trial court to do so on remand. See Davis v. Devereux Found., 209 N.J. 269, 296 (2012) (declining to impose a new tort duty "[a]bsent an appropriate record"). We offer no opinion on the outcome.

We need comment only briefly on our agreement with plaintiffs that the jury's verdict in favor of Bastian and Furey was against the weight of the evidence. Nothing is more well-settled than a homeowner's duty towards business "invitees, including prospective purchasers, to make reasonable inspections of the property and to remedy any reasonably discoverable defects." Hopkins, 132 N.J. at 441. "That standard of care encompasses the duty to conduct a reasonable inspection to discover latent dangerous conditions." Id. at 434. The owner's duty "to make reasonable inspections to discover hazardous conditions" is nondelegable. Id. at 441; Sanna v. Nat'l Sponge Co., 209 N.J. Super. 60, 66 (App. Div. 1986).

Whether homeowners in Cape May County make regular inspections of their wood decks is immaterial; they have a non-delegable duty to their business invitees to do so in order to discover hazardous conditions. It is also of no moment that the owners wouldn't "know to crawl under the deck and look for damaged or rusted fasteners at the ledger board." The law imposes on them "a duty of reasonable care to guard against any dangerous conditions on [their] property that the owner either knows about or should have discovered." Hopkins, 132 N.J. at 434. This deck collapsed within twenty seconds of three, average-size people stepping onto it. It is inconceivable, especially in light of the photographs and remnants of the deck entered in evidence, that a reasonable inspection, which would have revealed the temporary support beams shoring up the neighbor's deck on the same exterior wall, would not have revealed its dangerous condition. Allowing this verdict to stand "'would constitute a manifest denial of justice.'"[16] Hayes, 231 N.J. at 385-86 (quoting Risko v. Thompson Muller Auto. Grp., Inc., 206 N.J. 506, 521 (2011)).

_____

[16] We reach this conclusion fully aware that plaintiffs' counsel, in essence, "told the jury how to answer jury question number four," and thus plaintiffs' argument that the verdict was against the weight of the evidence is inconsistent with the position they took at trial that the evidence was insufficient to support a verdict against Bastian and Furey. Although we are generally disinclined to relieve a party of their own strategic decisions, Brett v. Great Am. Rec., 144

We reverse the no-cause verdicts entered in favor of defendants on liability and remand for a new trial or such further proceedings not inconsistent with this opinion. We do not retain jurisdiction.

Reversed and remanded.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

N.J. 479, 503 (1996) (quoting State v. Pontery, 19 N.J. 457, 471 (1955)) (holding a party cannot "take his chance on the outcome of the trial and if unfavorable, then condemn the very procedure he sought and urged"), the judge's refusal to undertake a full-duty analysis under Hopkins, which, if successful, would have imposed a duty on both defendants to plaintiffs, 132 N.J. at 442, and the erroneous instruction on mortgagee in possession make it appropriate to do so here, Brett, 144 N.J. at 508 ("We would not apply the doctrine of invited error where to do so would cause a fundamental miscarriage of justice.").